OPINION
Appellants, William Turner and his wife Thelma Turner, separately appeal a judgment of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of their daughter, Billie Jo Turner ("Billie Jo"), born June 4, 1987, and their son, Michael Turner ("Michael"), born March 19, 1991, to appellee, Butler County Children Services Board ("BCCSB"), and divesting them of all parental rights.
On April 11, 1994, BCCSB received a call from Mrs. Turner, who stated that she could not handle her children any more and that if she did not get some help, she was afraid she would hurt them. Sharon Bogan, a BCCSB social worker, and the Middletown Police Department responded to the Turner residence following the call. Bogan testified that Mrs. Turner sounded very distressed and upset and that she appeared to have "been in drugs." Because neither parent could guarantee the safety of their children, the children were removed and placed in foster care. The next day, BCCSB filed complaints in dependency on behalf of the children. The children were subsequently returned to their parents' custody on the condition that the parents participate in the Family Preservation Program ("FPP"). By agreement, the case was not adjudicated.
The Turners successfully completed the FPP on July 6, 1994. During the program, several problems were identified. Mrs. Turner had a serious problem with abusing prescription medications. Although she had treatment for the problem in the past, she still had relapses. Mrs. Turner had also been diagnosed as suffering from depression which at times made it difficult for her to cope with her children. It was determined that Mr. Turner had not always been a reliable caregiver. The Turners also had problems with parenting and supervising their children, as well as budgeting their money. Following completion of the FPP program in July 1994, the program provided the Turners with after care visits as needed.
On November 29, 1994, Mrs. Turner called Sandra Sebastian, an FPP worker who had worked with the Turners. Mrs. Turner told Sebastian that she needed help because Mr. Turner had gone hunting and had left her with little money or food. Mrs. Turner also told Sebastian that she was in a lot of pain[1] and that she could not cope. Sebastian testified that with her help, Mrs. Turner appeared to be coping with the children even though she was stressed.
In the evening of December 1, 1994, however, Mrs. Turner could not cope. Sebastian testified that Mrs. Turner was extremely aggravated with the children who were then "completely out of control." Sebastian helped Mrs. Turner put the children to bed and stayed with Mrs. Turner until the children fell asleep. Mr. Turner was still on his hunting trip.[2] Sebastian left the Turners' residence at 10:30 p.m. and planned to come back the next morning to help with the children and breakfast.
On December 2, 1994, at about 1:00 a.m., however, Mrs. Turner called the FPP Hotline, stating that she had taken several pills and drunk an entire bottle of Nyquil and some brandy. Mrs. Turner was by then very distressed and threatened to set herself on fire. The Middletown Police Department was dispatched to the Turners' residence. The children were removed and placed in foster care. Mrs. Turner was taken to the Middletown Regional Hospital and admitted to the Mental Health Unit. Mr. Turner subsequently testified that although he was afraid Mrs. Turner might "O.D." when he left on this hunting trip, he nevertheless left the children in her care.
On December 2, 1994, BCCSB filed complaints in dependency on behalf of the children and obtained temporary custody of them. The children remained together in foster care. The Turners were first granted bi-weekly supervised visitation. This was later changed to bi-weekly unsupervised visitation on one weekend day.
On December 23, 1994, a case plan regarding both children was filed in the trial court. The plan required the Turners to each complete a drug/alcohol assessment and to follow all recommendations. It also required the Turners to each undergo evaluations at the Children's Diagnostic Center ("CDC"), to participate in parent education classes and the Development of Living Skills "(DLS") program, and to provide a stable home for the children. On April 17, 1996, a modified case plan requiring the Turners to also participate in drug counseling and marital therapy was filed in the trial court. On March 8, 1995, the trial court found both children to be dependent children.
On February 23, 1995, the Turners missed their first appointment scheduled for 12:15 p.m. at DLS because they slept through the appointment. The Turners started the DLS program in March 1995 and completed its core lessons in July 1995. In a report dated October 17, 1995, Karen Lavender, a DLS educator, stated that although the Turners accepted the DLS program, they never fully understood why it was recommended. Lavender further stated that money management was a major concern and that there were so many communication problems between the Turners that parenting could not be addressed.
In March 1995, the Turners started marital therapy at Catholic Social Services ("CSS") with Lucia Freire. During the course of the treatment, it was determined that marital therapy was not appropriate due to the high level of potential violence between them. As a result, the Turners started having individual sessions each. At one point, however, only Mrs. Turner continued receiving treatment. CSS closed the case on November 28, 1995 because of poor attendance and a lack of commitment to carry on with the treatment. The Turners resumed marital therapy in January 1996 at Comprehensive Counseling Services ("CCS") with Trudy Prugh. Prugh was later replaced by Judy Frederick, who reported in July 1996 that Mrs. Turner was not making progress in treatment and that she had missed a number of appointments.
Mrs. Turner refused in September 1994 to complete a drug/alcohol assessment even though she had previously agreed to. It is not clear whether she ever completed such assessment. Following Mr. Turner's assessment, it was determined that he needed treatment. The Turners started drug counseling at Drug Counseling Services ("DCS") late March 1995. Mr. Turner completed the program in November 1995. Sylvia Stevens, a therapist at Behavioral Counseling Services ("BCS"), formerly known as DCS, testified however that Mr. Turner's sobriety following completion of the program was questionable. Mrs. Turner's case at DCS was closed in June 1995 because of poor attendance. Mrs. Turner re-entered treatment in January 1996 at BCS. She attended treatment fairly regularly until she was hospitalized for a week in the Careview Psychiatric Unit of Grandview Hospital in Dayton in March 1996 for depression and a nervous breakdown. Mrs. Turner briefly resumed treatment after her hospitalization.
The record shows that Mrs. Turner was recommended twice for the Sojourner Home drug treatment program. The Sojourner Home is a long term residential treatment facility for women with chemical dependency problems. It was recommended that Mrs. Turner stay at the Sojourner Home at least six months. Mrs. Turner first refused to go to Sojourner. In May 1996, however, Mrs. Turner agreed to use the Sojourner outpatient program. She attended only two out of six scheduled days of treatment and her case was subsequently closed.
On May 17, 1995, the children's guardian ad litem filed a motion for restriction of visitation because of a high risk of possible violence between the Turners. It was reported that one time following the children's removal from the Turners' custody, Mr. Turner had held a knife to Mrs. Turner's throat while she, in turn, had tried to shoot him. The gun was not loaded. The trial court granted the guardian ad litem's motion and visitation was again supervised. The record shows that the Turners were fairly consistent with visitation. However, they were at times forgetful of visits when scheduling other appointments. The record also shows that if Michael could not come to the visit, Mrs. Turner would request that the visit be canceled as she did not wish to visit with Billie Jo only.
The Turners both completed CDC evaluations on October 9, 1995. The evaluations concluded that the Turners' ability to access treatment successfully was questionable due to their low intelligence scores, the likelihood of an organic or neurological problem, and their motivation. The evaluations further concluded that "this examiner can think of no other services to offer this couple other than the one [sic] already in place. * * * [T]his examiner questions their motivation and ability to access therapeutic intervention. Their prognosis is quite guarded."
On April 2, 1996, BCCSB filed a motion for permanent custody of both children. A final hearing on BCCSB's motion was conducted on August 13, 1996. During that hearing, the Turners both testified that they were now living with Mrs. Turner's uncle, his wife, and his two children in a three bedroom house. Mr. Turner testified that he left the marital residence first to avoid getting into an argument with Mrs. Turner. Mrs. Turner testified that she then left the marital residence because she could not pay the bills. Mrs. Turner testified she was on the Metropolitan Housing waiting list for a three bedroom residence for her and the children.
At the time of their removal from the Turners' custody in December 1994, the children were described as children with psychological concerns and behavioral problems, which included being physically aggressive toward each other, verbally attacking each other, exhibiting sexual curiosity toward each other, and teasing, harming, and at times, killing animals. By contrast, by the end of 1995, it was reported that both children, who are currently living in the same foster home, had stabilized, were benefiting from their foster placement, and had made great progress since their removal from their parents' custody. Billie Jo, in particular, has shown tremendous academic improvement, improving her grades from F's to B's. Adoption assessment reports for both children from July 1996 concluded that both children were adoptable and in need of permanence as soon as possible.
By judgment entry filed September 4, 1996, the trial court held that Billie Jo and Michael could not be placed with either parent within a reasonable period of time and granted permanent custody of both children to BCCSB, thus divesting the Turners of their parental rights.
The Turners appealed separately in a timely manner. In their respective sole assignment of error, the Turners both argue that the trial court's decision was against the manifest weight of the evidence.
It is well-established that in reviewing a trial court's grant of permanent custody of children to a public agency, an appellate court cannot reverse a decision supported by competent, credible evidence going to all essential elements of the case as being against the manifest weight of the evidence. In re Lay (1987),43 Ohio App.3d 78, 80. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the * * * court is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80.
R.C. 2151.414(B) provides that permanent custody may be granted to an agency if the juvenile court determines by clear and convincing evidence that an award of permanent custody is in the best interest of the child and that any one of the three factors in R.C. 2151.414(B) apply. For purposes of this appeal, the relevant factor in R.C. 2151.414(B)(1) provides that permanent custody may be granted to the movant if the child is not abandoned or orphaned and the child cannot be placed with either parent within a reasonable time.
In determining whether the award of permanent custody to an agency is in the best interest of the child, a trial court must consider all relevant factors which include, inter alia, the child's probability of adoption and whether adoptive placement would benefit the child, the child's interactions with family members and others, the child's custodial history, and the child's need for a legally secure permanent placement. R.C.2151.414(D).
In determining whether a child cannot be placed with either parent within a reasonable time, R.C. 2151.414(E) states that such a finding shall be entered if it is determined by clear and convincing evidence that at least one of eight conditions set forth in the section exists with respect to each of the children's parents. In re Krista House (Feb. 24, 1992), Butler App. Nos. CA91-06-016, CA91-02-022, unreported. Three of these conditions apply in this case and read as follows:
 (1) Following the placement of the child outside his home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside his home. In determining whether the parents have substantially remedied those conditions, the court shall consider primary utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 (2) The severe and chronic mental illness, severe and chronic emotional illness, severe mental retardation, severe physical disability, or chemical dependency of the parent makes the parent unable to provide an adequate permanent home for the child at the present time and in the foreseeable future;
* * *
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]
R.C. 2151.414(E)(1), (2), and (4).
Clear and convincing evidence is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. State v. Schiebel (1990), 55 Ohio St.3d 71, 74, certiorari denied in Warner v. Ohio (1991), 499 U.S. 961, 111 S.Ct. 1584; In re Weaver (1992), 79 Ohio App.3d 59, 63.
After thoroughly reviewing the record, we find that both parents failed continuously and repeatedly to remedy the conditions causing the children to be placed outside the home. With regard to both parents, the record clearly shows a lack of commitment to carry on with prescribed treatment. In a November 1995 letter to BCCSB, Freire, the Turners' marital therapist at CSS until their case was closed, stated that while the Turners seemed to be aware of their problem areas, their awareness was not enough to make them work on their goals as they seemed to follow in the pattern of wanting to "fix their problems" without acting on fixing them. In addition, while the Turners completed the CDC evaluations and some of the required programs such as the DLS core program, it is undisputed that several other programs were terminated due to poor attendance.
The record also shows that although several workers/therapists of various services expressly recommended to the Turners that they separate due to serious problems in their marital relationship, they had a pattern of separating only to reconcile soon after.
With regard to Mrs. Turner, her CDC evaluation provided in relevant part that:
Cognitive Functioning:
 To evaluate her level of cognitive functioning, Ms. Turner was administered a prorated form of the Weschsler Adult Intelligence Scale — Revised. During this testing, she was lethargic and did poorly. Ms. Turner earned an estimated Full-scale IQ of 66, a score that places her in the mildly mentally retarded classification. While this finding may well underestimate her actual cognitive ability, it does reflect her lack of motivation, poor problemsolving skills, and lethargy.
Psychological Functioning:
 * * * Her overall profile is quite serious and features a number of significantly elevated scales. Individuals who score in this manner have been found to be angry, sullen, irritable, and suspicious of others. They almost always exhibit severe social maladjustment. Research with this profile type has also found that these are individuals who blame others for their problems. They also tend to be manipulative, rigid, and argumentative. Overly sensitive to criticism, these are often individuals who have difficulty accepting even helpful comments from others.
 Ms. Turner's testing is also consistent with individuals who express thoughts of suicide from time to time and who make threats. Such ideation is often in the service of gaining attention from others. Ms. Turner is likely to be lacking in impulse control, and she may exhibit a cyclical pattern of acting out. Ms. Turner is also likely to be someone who harbors intense conflict over dependence/independence matters. In other words, much of her anger appears to stem from her fear of being overly dependent upon others, and such a finding is not uncommon in battered spouses. * * *
 Consistent with her history, the value of the MacAndrew Alcoholism Scale from the MMPI is quite elevated. This finding highlights Ms. Turner's battle with substance abuse. Also, the Bender Gestalt was administered as a screening for possible organic concerns, particularly given her history of substance abuse. Her protocol is indicative of neurological impairment, and this finding may also have an impact on her lower-then-[sic]expected intelligence score.
A review of the record confirms Mrs. Turner's constant battle with substance abuse and her inconsistency in following prescribed drug therapy. Indeed, while Mrs. Turner started several drug counseling programs, all of them were eventually terminated due to her poor or lack of attendance. At the August 13, 1996 hearing, Mrs. Turner admitted she had an ongoing battle with prescription medication and that she had been in and out of treatment. Mrs. Turner testified that she wanted to get treatment and that she was willing to follow the Sojourner Home inpatient program. Mrs. Turner also testified that she had gone to the AA meetings every night for the last week.
The record also clearly shows Mrs. Turner's chronic inconsistency in taking her anti-depressant medication despite her obvious need for it. This is of great concern, particularly in light of her hospitalization for one week for depression and a nervous breakdown. At the February 15, 1995 hearing, at least two workers testified that when Mrs. Turner was taking her anti-depressant medication, she was cheerful and capable of functioning and that her social skills dramatically improved.
At the same hearing, Marcia Retherford, a BCCSB and FPP worker, testified that Mrs. Turner was a good mother to her children and that she always did what the BCCSB workers suggested. Retherford testified, however, that Mrs. Turner's history of substance abuse was of concern. Mary Samuelson, the BCCSB worker who was assigned to the Turners' case, opined that Mrs. Turner had some good qualities and that both parents were capable of caring for their children but that they needed to follow through with some services.
At the August 13, 1996 hearing, Sylvia Stevens, a therapist at BCS, testified that at the beginning of her drug counseling therapy, Mrs. Turner showed a lot of interest in coming to counseling. However, following her week long hospitalization for depression, Mrs. Turner only briefly resumed treatment. With regard to Mrs. Turner's capacity to parent her children, Stevens testified that it was possible but that Mrs. Turner needed to go through programs to find out if she could.
Judith Frederick, a counselor at CCS, testified that Mrs. Turner needed to be in treatment "a good six months" and that she also needed to gain a sense of independence as a person. On cross-examination, Frederick reiterated that even with independent housing, Mrs. Turner needed to be consistent with therapy programs at the very minimum for six months before she could care for her children. Frederick testified that Mrs. Turner was then trying very hard to commit to the program but that it seemed difficult for her to follow through. Finally, Frederick testified that while Mrs. Turner was thirty-four years old, she was fifteen years old developmentally.
Mrs. Turner testified that she loved her children very much and that she wanted them back. Mrs. Turner testified that if she got a residence through Metropolitan Housing, only she and her children would live in it. Mrs. Turner testified that she was receiving $470 a month in S.S.I. benefits. Mrs. Turner further testified that if she had custody of her children, she would get a job. Mrs. Turner admitted, however, that she had not worked since the mid to late 1980s. Mrs. Turner has done factory work and restaurant work in the past.
After thoroughly reviewing the record, we find that clear and convincing evidence establishes that the conditions set forth in R.C. 2151.414(E)(1), (2) and (4) were satisfied with regard to Mrs. Turner. We further find that the trial court's finding that the children could not be placed with Mrs. Turner within a reasonable time was not against the manifest weight of the evidence.
With regard to Mr. Turner, his CDC evaluation provided in relevant part:
Cognitive Functioning:
 Mr. Turner was also administered a pro-rated form of the Wechsler Adult Intelligence Scale — Revised. As did his wife, he did quite poorly on this testing and exhibited very poor problem-solving skills. He earned an estimated Full-scale IQ of 68, a finding that places him in the mildly mentally retarded range. As was noted with Ms. Turner, this finding appears to underestimate his actual ability, although the results are compelling in terms of motivation and poor performance.
Psychological Functioning:
 Although somewhat defensive, the profile generated by Mr. Turner on the MMPI was determined to be valid. His overall profile features no significantly elevated scales except for the MacAndrew Alcoholism Scale which is markedly elevated. This finding highlights his years of substance abuse. In terms of the clinical scales, Mr. Turner's profile is consistent with an individual who has substantial issues of anger, but who has difficulty expressing this appropriately. He is likely to be someone who holds grudges, and this finding is perhaps borne out in Ms. Turner's comments about his continuing to fault her for the removal of the children.
 Of equally serious concern is Mr. Turner's protocol on the Bender Gestalt. He did rather poorly on this testing and rated seven of the nine stimulus designs. This is indicative of a neuropsychological problem which may well be related to his years of substance abuse.
With regard to Mr. Turner's substance abuse, the CDC evaluation also provided that Mr. Turner "began drinking alcohol at the age of eleven or twelve and that over the years, he typically drank a six-pack of beer each night, although he would drink more on the weekends." The record shows that while Mr. Turner completed a drug counseling program at DCS, his subsequent sobriety was questionable. Mrs. Turner reported several times to BCCSB that Mr. Turner was drinking again. At the August 13, 1996 hearing, when asked whether he had relapsed since completion of the program, Mr. Turner replied "[n]ot the first time." At that same hearing, Mr. Turner testified that he had gone to AA meetings every night for the last week. Mr. Turner testified that before that, he would go to the meetings maybe once a month or every three or four months. Sylvia Stevens testified that after his completion of the drug counseling program, which involved staying sober ninety days and having less than three absences, Mr. Turner was supposed to continue with AA meetings and a sponsor.
With regard to marital therapy, Freire stated in an April 1995 letter to BCCSB that Mr. Turner was uncooperative in counseling as he did not acknowledge any problems in himself or his marital relationship to work on.
At the February 15, 1995 hearing, Sandra Sebastian testified that completion of a FPP program only requires a minimum level of participation. Sebastian testified that while she was at the Turner residence every weekday for ten weeks, Mr. Turner was involved in the program about once each week or less. With regard to visitation, the record shows that Mr. Turner did not always show up for the visits and that at least on one occasion, he slept for half of the visit.
At the August 13, 1996 hearing, Mr. Turner testified that he wanted to have custody of the children. Mr. Turner stated that if Mrs. Turner would get off the drugs, he would love to see her get the children, with or without him. Mr. Turner also testified that prior to the children's removal, Mrs. Turner was the primary caretaker and that the children were not getting on his nerves because "[he] worked, and [he] hunted, and [he] fished a whole lot." Mr. Turner opined that because of the counseling he had been through, he "could do a lot better job than [he] did before * * *." With regard to employment, Mr. Turner testified that he was a laborer. Mr. Turner also testified that the last time he worked full time was two years ago and that his longest period of employment since he was married to Mrs. Turner was eight months. The Turners were married in 1986. Mr. Turner testified that he worked four hundred sixteen hours so far in 1996, nine hundred hours in 1995, and well over a thousand hours in 1994. When he is not working, Mr. Turner receives unemployment.
After thoroughly reviewing the record, we find that clear and convincing evidence establishes that the conditions set forth in R.C. 2151.414(E)(1) and (4) were satisfied with regard to Mr. Turner. We further find that the trial court's finding that the children could not be placed with Mr. Turner within a reasonable time was not against the manifest weight of the evidence.
In light of all of the foregoing, we therefore hold that the trial court's decision to award permanent custody of the children to BCCSB was not against the manifest weight of the evidence. The Turners' respective assignments of error are overruled.
Judgment affirmed.
YOUNG, P.J., and WALSH, J., concur.
[1] Mrs. Turner was diagnosed with having tumors in her digestive system.
[2] Mr. Turner left on his hunting trip on November 24, 1994 and returned on December 3, 1994.