OPINION
Marshall Smith appeals from the judgment of the Miami County Common Pleas Juvenile Division granting permanent custody of Katelyn Smith to the Miami County Children's Services Board (MCCSB).
On September 5, 2000, MCCSB filed a complaint alleging that Katelyn Smith (d.o.b. 7-17-98) appeared to be a dependent and neglected child, as defined by statute. Katelyn was alleged to be the child of Kim Buckner of West Milton, Ohio. The complaint also alleged that Marshall Smith was the putative father of Katelyn and that his whereabouts were unknown. In the complaint, MCCSB asked for temporary custody of Katelyn.
Interim custody of Katelyn was granted to MCCSB on September 6, 2000. The court ordered Marshall Smith to be served by publication after Angelique Ferguson, an employee of MCCSB, stated in an affidavit that she was unable to locate Smith. Subsequently, on September 15, 2000, Marshall Smith appeared at a legal rights hearing and received a copy of the complaint. At that time, Smith asked for counsel to be appointed. He also requested a trial on all adjudicatory and dispositional issues.
Both Buckner and Smith were served with notice of the dates for the adjudicatory and dispositional hearings, which were set for October 25, 2000, and November 9, 2000, respectively.
The adjudicatory hearing was held on October 25, as scheduled, but neither Buckner nor Smith appeared. Consequently, on October 31, 2000, the court filed an entry, adjudicating Katelyn a dependent child as defined by R.C. 2151.04(C). In the same entry, the court ordered Katelyn to remain in the interim custody of MCCSB, pending the dispositional hearing.
The dispositional hearing was held as scheduled, and the court then filed an entry on November 28, 2000, granting MCCSB temporary custody of Katelyn. At the same time, the court approved the case plan. Again, neither Buckner nor Smith appeared for the dispositional hearing. However, they both did appear for a formal review hearing on February 21, 2001. At the time, both Smith and Buckner were in jail and were conveyed to court for the hearing. After hearing evidence, the court found that the parties had failed to comply with the case plan. As a result, the court ordered MCCSB to file a concurrent case plan and a motion for permanent custody. The court also ordered genetic testing for purposes of determining paternity.
On March 23, 2001, a concurrent case plan was approved by the court. Although the entry stated that the parties were in agreement, the case plan indicates that Smith had not seen the plan because he was incarcerated. However, Smith's attorney did participate and did sign the plan. According to the plan, Buckner and Smith were to participate in drug/alcohol and psychological evaluations, parenting classes, and progressive visitation contingent upon service progress. Further, Smith was to establish paternity. The plan's primary goal was reunification of the child with Buckner; if that could not be accomplished, then permanent custody was the goal. Subsequently, on April 16, 2001, MCCSB moved for permanent custody of Katelyn. A hearing on the motion was then held on June 14, 2001. Marshall Smith was conveyed from the Correction Reception Center in Orient, Ohio, and was present for the hearing.
Following the hearing, the magistrate made the following pertinent findings of fact:
 Marshall Smith is Katelyn's putative father. Both he and Kim Buckner love Katelyn. Marshall was incarcerated at the Reception Center on December 31, 2000 for six months on a charge of receiving stolen property. He testified he would be released on June 28, 2001. He acknowledged that over the past five years he has spent a significant amount of time in jail.
 Marshall has not completed any case plan services and has not contacted MCCSB at any time regarding what he needs to do. He did testify he is willing to complete the plan. He lived with his parents in West Milton for three years prior to his incarceration. He is a painter who testified he could be employed after his release from prison. From September 2000 to December 31, 2000 Marshall had no contact with Katelyn.
 After making findings of fact, the magistrate found that MCCSB had made reasonable efforts to reunite Katelyn with her parents. However, the magistrate noted that these efforts were unsuccessful because the parents did not visit with Katelyn, maintain contact with MCCSB, or remedy the problems that brought Katelyn into care with MCCSB. Consequently, the magistrate recommended that MCCSB be awarded permanent custody of Katelyn.
Smith filed objections to the magistrate's report. Specifically, he noted his testimony that he was unaware of the provisions of the case plan because he was incarcerated. Additionally, Smith argued that MCCSB made no effort to help him complete paternity tests while he was incarcerated. In overruling Smith's objections, the trial court made the following findings:
 1. Mr. Smith has never established paternity to support the allegation that he is indeed the father of Katelyn. He had from July 17, 1998, until his incarceration on December 31, 2000, (two and one-half years) and never attempted to do so. (Entry of Formal Review Hearing, March 1, 2001).
 2. The child has never lived with her father for any period of time (Custody Affidavit, September 6, 2000).
 3. Mr. Smith's whereabouts were unknown to Miami County Children's Services Board at the time of the filing of the complaint. (Complaint, September 5, 2000).
 4. Mr. Smith was located and appeared in Court on September 15, 2000, to request court appointed counsel. (Entry of Legal Rights, September 28, 2000).
 5. Mr. Smith then failed to appear at the adjudication hearing on October 25, 2000, or at the dispositional hearing on November 9, 2000. (Entries of Adjudication, October 31, 2000, and Disposition, November 28, 2000).
 6. Mr. Smith was present at a Formal Review Hearing on February 21, 2001, through a warrant to convey from the Montgomery County Jail, at the request of his attorney. At said hearing, the testimony was clear that neither party had initiated or complied with case plan services. The Magistrate ordered Miami County Children's Services Board to file a concurrent plan for the child, including a motion for permanent custody. (Entry from Formal Review Hearing, March 1, 2001).
 7. Case plans and case plan amendments were mailed by the Court to Mr. Smith at whatever address he supplied to the Court. (Dispositional Entry Initial Case Plan mailed December 13, 2000 and Entry from Formal Review Hearing and Amendment #1 signed by Mr. Smith on February 21, 2001, mailed March 2, 2001, Concurrent Case Plan, mailed March 26, 2001).
 8. Mr. Smith never contacted Miami County Children's Services Board to inquire what he needed to do. (Finding of Fact #21).
 9. Mr. Smith could have visited Katelyn (108 consecutive days to request visits prior to his incarceration) and never requested a visit. (Finding of Fact #23).
 It is apparent to the Court that there is ample evidence that Mr. Smith did nothing prior to, nor during, his incarceration to visit, get to know Katelyn or attempt any case plan services. Merely alleging his willingness to do services is hardly a basis for considering Mr. Smith as a potential care giver for a child who was in custody for over nine months as of the date of the permanent custody complaint.
 The Court finds that the Magistrate's Decision is supported by ample evidence and overrules the first Assignment of Error.
 2. Children's Services Board Did Not Provide Best Efforts.
 Mr. Smith infers that he could not complete a case plan that he did not have. The Court mailed a case plan to Mr. Smith on December 13, 2000. Mr. Smith knew Katelyn was in custody by at least September 15, 2000, and he never inquired how he could visit, let alone how he could obtain custody. There is some burden on Mr. Smith to show an interest.
 The caseworker testified the great lengths that she went to in an effort to establish paternity but her efforts were thwarted through no fault of her own. Mr. Smith was moved from Montgomery County Jail to the Orient prison, then to a hospital and back to prison. The caseworker simply ran out of time before the June 14, 2001, hearing. It is also quite difficult for the caseworker to set up other services to be completed when she has difficulty keeping up with the whereabouts of Mr. Smith. The caseworker made some efforts and Mr. Smith made no efforts.
 Mr. Smith alleges that the adopting of Katelyn had a fifty-fifty chance of being detrimental to Katelyn (testimony of caseworker, Tr. Pg. 63). That is a complete misstatement of the witness. The caseworker testified that there was a fifty-fifty chance that Katelyn would be bothered by her lack of relationship with biological parents (genetic roots). An adoption can be completely successful and a child can still be bothered by not knowing her genetic roots and go in search of information. A desire for this information may, or may not, have any relationship to the success, or lack thereof, of the adoptive relationship.
 The second assignment of error is overruled and without merit.
 The Court hereby adopts the decision of the Magistrate and incorporates all of the orders as a final judgment of this Court as if fully rewritten herein.
 (Emphasis in original). Accordingly, the trial court terminated the parental rights of Smith and Buckner.
Kim Buckner did not appeal from the trial court decision. Smith timely appealed, and raises the following assignments of error:
I. Children's Service Board did not provide diligent efforts to assist the father as required by R.C. 2151.414(E).
II. The trial court's decision is not supported by clear and convincing evidence and is against the manifest weight of the evidence.
 I
In the first assignment of error, Smith claims that MCCSB is statutorily required to make diligent efforts to help parents remedy the problems that cause a child to be placed outside the home. According to Smith, MCCSB failed to make such efforts. Allegedly, MCCSB did not know if Smith had the first case plan and made little effort to contact him because he was only the putative father. Further, after MCCSB learned Smith was incarcerated, the caseworker did not refer Smith to services that could have helped him complete the case plan.
In contending that MCCSB was required to provide "diligent efforts," Smith relies on R.C. 2151.414(E)(1), which discusses standards for deciding if a child can or should be returned to the parents. However, to put this issue in proper perspective, we first focus on R.C.2151.414(B)(1), which provides, in relevant part, that:
 the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
(b) the child is abandoned.
Subsection (D) of R.C. 2151.414 establishes the following factors for the court to consider in determining the best interest of the child:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
After considering if a grant of permanent custody to the agency is in the child's best interest, the court then considers whether the child "cannot be placed with either parent within a reasonable period of time or should not be placed with the parents." R.C. 2151.414(E). If the court decides, by clear and convincing evidence, that one or more of the factors in R.C. 2151.414(E)(1) through (16) applies, the court must enter a finding that the "child cannot be placed with either parent within a reasonable time or should not be placed with either parent."
The factor which Smith has focused on in this case is R.C.2151.414(E)(1), which provides that:
 [f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
However, this factor is irrelevant to the present case, as the magistrate and judge did not rely on R.C. 2151.414(E)(1). Instead, the ground for the decision was R.C. 2151.414(E)(4), which covers situations where:
 [t]he parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
In this regard, the magistrate and judge concluded that Smith had shown a lack of commitment by failing to contact MCCSB while Katelyn was in custody or to take any steps to establish a legal or emotional relationship. The magistrate also concluded that the parents had abandoned Katelyn. See R.C. 2151.414(B)(1)(b) and (E)(10).
Notably, only one of the factors in R.C. 2151.414(E)(1) through(16) must be present before the trial court is required to make a finding that the child cannot or should not be placed with the parents. Since the court in this case made a finding under R.C. 2151.414(E)(4), it did not have to also find that the parents repeatedly failed to substantially remedy conditions, notwithstanding "reasonable case planning and diligent efforts" by the agency. Therefore, Smith is incorrect when he says that the agency was required by R.C. 2151.414(E)(1) to make "reasonable and diligent efforts." That may be true if the court relies on that particular factor. However, the remaining factors do not contain such a requirement.
We do note that the magistrate mentioned in passing that the parents failed to remedy the problems that brought Katelyn into the care of MCCSB. To the extent this may potentially trigger R.C. 2151.414(E)(1), we will address Smith's arguments. We would do so anyway, as we have previously imposed an additional requirement on award of permanent custody, i.e., we have said the agency must prove that reasonable efforts have been made to reunite the child and parent, or that such efforts would be futile. In the Matter of Lawson/Reid Children (Apr. 18, 1997), Clark App. No. 96-CA-0010, unreported, 1997 WL 189379, p. 3. We should stress that, in spite of this requirement, "`[t]he issue is not whether CSB could have done more, but whether it did enough to satisfy the "reasonableness" standard under the statute.'" In re Jackson (Aug. 13, 1999), Montgomery App. No. 17514, unreported, 1999 WL 958512, p. 6 (citation omitted). Further, our review of the trial court's decision on reasonableness is based on an abuse of discretion standard. In theMatter of Marrs (Dec. 28, 1998), Clark App. Nos. 97-CA-79, 97-CA-80, unreported, 1998 WL 896669, p. 6.
After reviewing the file and transcript in this case, we have concluded that the trial court did not abuse its discretion in finding that MCCSB made reasonable efforts at reunification. Admittedly, MCCSB did not do all that it could. The caseworker conceded as much when she testified that she did not think to inquire about services in another county for Smith during the time he was incarcerated. According to the caseworker, that was her "omission."
On the other hand, the reality is that Smith chose to see his child only once, in September, 2000. He also did nothing on the case plan from September through December, 2000. In fact, Smith did not even contact MCCSB to inquire about his child or to inform the agency of his progress. Significantly, Smith was not incarcerated during this time and was free to work on case plan requirements.
Additionally, Smith did not appear for the adjudicatory and dispositional hearings in October and November, 2000, even though he received notice of the hearing dates. Even after Smith was incarcerated, he did not notify either CSB or the court of his whereabouts prior to the time that he filed a request to be conveyed from jail to the February 21, 2001 review hearing. (The request was filed one day before the hearing, i.e., on February 20, 2001). This was more than five months after custody was awarded to MCCSB and almost five months after Smith's last contact with either his daughter or the agency.
Furthermore, Smith was sent a copy of the original case plan that was originally filed on November 22, 2000, and his attorney also received a copy. Therefore, he should have been aware of the content of the case plan. The requirements in this plan were essentially the same as those in the concurrent case plan filed in March, 2001, i.e., both plans called for psychological evaluations, drug and alcohol assessments, no further violations of the law, a demonstration of bonding with the child, parenting classes, and demonstration of adequate housing and employment, through rent receipts and pay stubs. Smith made no progress on this case plan before the February 21, 2000 review hearing, and MCCSB had no indication that Smith ever intended to make any progress. In this regard, the caseworker indicated that both Smith and Buckner were given referrals to a psychologist and for drug and alcohol assessments. Again, no action was taken on these matters, even before Smith was incarcerated.
As an additional point, Smith's attorney signed the concurrent case plan, and was aware of its content. Under the circumstances, Smith had some obligation to show an interest in the proceedings. Compare, In theMatter of Jayvona T. (Aug. 4, 1995), Lucas App. No. L-94-327, unreported, 1995 WL 458778 (noting that even incarcerated parent has an obligation to contact the agency and take some initiative in responding to agency requirements); and In re Collins (Aug. 24, 2000), Franklin App. Nos. 99 AP-1468, 99 AP-1469, unreported, 2000 WL 1199223, p. 3 (affirming divestiture of parental rights where, among other things, father did not participate in agency's services before being incarcerated).
We also note that the caseworker did try to schedule a paternity test, but her efforts were complicated by Smith's transfer from the county jail to another penal institution after the test was scheduled. Smith was also removed from that institution for medical care, causing further confusion or delay. While these particular matters were not Smith's fault, they also indicate that MCCSB did not fail to make reasonable effort. We have previously held that the agency must make a "good faith" effort to reunify the family. In re Potter Children (June 4, 1999), Clark App. No. 98 CA 72, 1999 WL 356288, p. 2. Good faith has been defined as "`an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage.'" In the Matter ofHermann (Jan. 27, 1995), Miami App. No. 94 CA 12, unreported, 1995 WL 29237, p. 4, quoting from In re Weaver (1992), 79 Ohio App.3d 59, 63.
Based on the evidence of record, we do not find that MCCSB showed a lack of purposeful effort, nor do we think MCCSB sought an unconscionable advantage. As we said, Smith had an obligation to make some effort. However, as the trial court noted — "[t]he caseworker made some efforts and Mr. Smith made no efforts." Accordingly, the first assignment of error is without merit and is overruled.
 II
In the second assignment of error, Smith claims that the trial court's decision is not supported by clear and convincing evidence and is against the manifest weight of the evidence. As we mentioned earlier, in granting permanent custody, the trial court must find by clear and convincing evidence that 1) one or more of the factors in R.C. 2151.414(E) are present, that "`2) permanent custody is in the best interest of the child, and that (3) reasonable efforts at reunification have been made or that such efforts would be futile.' * * * If the trial court finds by clear and convincing evidence that one or more of the factors listed in R.C. 2151.414(E) exist as to each of the child's parents, the trial court shall enter a finding that the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent."
Jackson, 1999 WL 958512, p. 6.
"`An appellate court will not reverse a trial court's determination concerning parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof.'" In re McCormick (Jan. 7, 2000), Clark App. Nos. 98 CA 47, 98 CA 48, unreported, 2000 WL 6198, p. 5 (citations omitted). "`Clear and convincing evidence is that which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.'" In re Orr/Hill Children (Feb. 12, 1999), Clark App. No. 98-CA-25, unreported, 1999 WL 64644, p. 2, quoting from Weaver
(1992), 79 Ohio App.3d 59, 64.
According to Smith, the trial court's decision was incorrect because Katelyn could have been placed in his custody within a reasonable time. In particular, Smith focuses on his own testimony that he was willing to complete the case plan and to provide a home for his daughter.
The trial court rejected this argument, stating that "merely alleging * * * willingness to do services is hardly a basis for considering Mr. Smith as a potential care giver for a child who was in custody for over nine months as of the date of the permanent custody complaint." We agree with this comment. As we mentioned earlier, Smith had ample opportunity to take concrete action before being incarcerated, but did nothing. After being incarcerated, Smith still took no action. Admittedly, some parts of the case plan would have been more difficult to accomplish in prison. However, Smith failed to make even token efforts. For example, at the February, 2001 review hearing, the court stated that both Smith and Buckner had until April 9, 2001, to give the caseworker the names, addresses, and phone numbers of anyone who would be available or willing to take Katelyn. However, Smith failed to provide any information to MCCSB.
Smith also claims that an award of permanent custody is not in Katelyn's best interests because she has (in the caseworker's view) a fifty percent chance of being detrimentally impacted by the lack of biological parents. This is a misinterpretation of the testimony. During cross-examination, the caseworker testified that a detrimental effect of being deprived of natural parents is that a child does not have a hereditary blood line. While this may be true, the circumstance is one all adopted children share; it is not a factor of unusual importance in the present case.
The caseworker also testified that some adopted children really try to find an emotional link to their past and some have no desire to know who their biological parents are. During this discussion, the caseworker expressed the opinion that whether a lack of genetic roots would be detrimental or not to Katelyn would be "fifty-fifty." Again, assuming this to be true, all adopted children share a similar burden and similar probability of detrimental effect. Absent evidence that the present case is unique in some way or that Katelyn would be affected in a manner different from other adopted children, the lack of genetic connection is simply a fact when children (irrespective of state involvement) are raised by persons who are not their biological parents.
Because clear and convincing evidence supports the trial court's decision to award MCCSB permanent custody, the second assignment of error is overruled.
Based on the preceding discussion, the first and second assignments of error are overruled. Accordingly, the judgment of the trial court is affirmed.
FAIN, J., and YOUNG, J., concur.