DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas which terminated appellants' parental rights and granted permanent custody of Ella C. to the Lucas County Children Services Board ("LCCSB"). Because we conclude that the trial court did not err in its findings, we affirm.
 {¶ 2} LCCSB obtained temporary emergency custody of Ella C., then ten months old, on February 21, 2004. On February 24, 2004, LCCSB filed a complaint, alleging dependency and neglect; this complaint was later amended to seek permanent custody. Appellants, the mother and father of Ella C., were present for the initial shelter care hearing and were ordered to undergo mental health diagnostic and substance abuse assessments and to submit to drug screens. Appellants could not appear for the first scheduled adjudication/permanent custody proceedings because father was hospitalized, and the case was continued.
 {¶ 3} Due to statutory time constraints, LCCSB dismissed the first complaint and refiled a second complaint for dependency and neglect on May 21, 2004, again seeking permanent custody and a motion for shelter care. Appellants again appeared at the shelter care hearing, and agreed to continue temporary custody of Ella C. with LCCSB. A pre-trial was conducted on July 1, 2004; the trial court conducted the adjudication/permanent custody hearing on July 13, 2004. Even though the trial court delayed the proceedings for more than two hours, appellants failed to appear at the adjudicatory/disposition hearings.
 {¶ 4} At the adjudication hearing, various witnesses testified that appellants had no permanent residence, often living in motels and an office space area that they had temporarily rented. Toledo police officers testified that Ella had been taken into custody from a hotel room at the Hampton Inn and Suites in Toledo, Ohio, on the afternoon of February 21, 2004. Appellants had allegedly vandalized the first suite they stayed in, overturning furniture and mattresses, strewing food and trash around the room, and spilling red cough medicine on the carpeting. When the manager called police to investigate, appellants had been moved to the suite next door. In that second suite, the officers found drug paraphernalia, including crack cocaine pipes and a "Chore Boy." Ella was in a crib near the door of the suite. The child was crying, wore a urine soaked undershirt and dirty diaper, had severe diaper rash, was pulling at her reddened right ear, and appeared to be ill with a fever. Police found no baby food, clothing, car seat, or other baby supplies in the room or in appellants' van. The van was filled with furniture, papers, books, clothing, "junk," and garbage. The van also contained a live bird in a cage and the doors were tied shut. Appellants showed no attachment or concern for the child, even as police were taking her into custody. Appellant father told police that he was suffering from cancer and had been treated in Oklahoma. He said since he had only two weeks to live, they were "living it up" and staying at the hotel. Appellants were arrested and Ella was taken to the hospital for medical treatment.
 {¶ 5} The Hampton Hotel manager also testified, corroborating Ella's physical condition. The manager verified that appellants had occupied both suites, that she had been present when the police arrived, and that she opened the door of the second suite when appellants failed to respond to knocks on the door. At the manager's request, appellant father eventually found a clean diaper and another outfit for the child. The manager changed Ella's diaper, saw the severe rash, and clothed her in the alternate outfit which was dirty but not wet. The manager asked for a bottle to feed Ella, but appellant father said they did not have any.
 {¶ 6} Anthony Cardenas, an assessment caseworker for LCCSB, testified that he first met the parents at a staffing held on February 24, 2004. He explained that a staffing is a conference held at Children Services with the parents/family, caseworkers, and a facilitator to address the concerns of a referral and to make a case plan. The parents denied any substance abuse or that they had caused the damage to the hotel room. They revealed that three other children had previously been removed from their custody and were now in the custody of a relative living in Michigan. Ella's paternal grandmother also attended the staffing; the parents said that they were residing with her in Michigan. Appellant father said they had stayed in the hotel because they were packing up his business items from his office in Toledo and going back to Michigan. Appellant father again stated that he had cancer, but that he received treatment which had "done wonders" and was now "doing fine." The parents indicated that Ella had received medical care and baby immunizations up in Michigan and would provide these records to LCCSB within a few days. Cardenas said he told the parents that he needed the information so as not to duplicate Ella's immunizations. The parents never provided this information.
 {¶ 7} The initial plan was to request temporary custody and to place Ella in foster care. At the shelter care hearing, the parents had been ordered to undergo drug screening. Cardenas said that the parents did initially comply with the order. He said that the parents attended a visitation with Ella on February 25, 2004. Appellant mother again assured Cardenas that she would provide the requested immunization records. A "joint home visit" was set for February 27, 2004 to introduce the parents to the ongoing caseworker, but the parents did not appear for that meeting. Cardenas said he left two voice mail messages at the phone number provided by the parents, but received no response from the parents. He also stated that the drug screens performed on both parents tested positive for cocaine. Cardenas received information from appellant father's sister that the custody proceedings involving the removal of Ella's siblings had taken place in Oakland, Michigan.
 {¶ 8} Heather Dixon, ongoing case manager, testified that she received the case on February 27, 2004. That same day, a "joint home visit" with the parents was scheduled at the agency since the parents did not have a home to visit, but the parents did not appear. Dixon said that she was unable to contact the parents and they made no attempts to contact her or to visit the child. Dixon unsuccessfully tried to notify the parents through their cell phone and through the paternal grandmother of a staffing to be held on March 2, 2004. At the staffing, the agency determined it needed to file for permanent custody. On March 5, 2004, the parents called Dixon, asking about the status of the case and if they could visit Ella. Dixon explained that the agency was seeking permanent custody, but said that the parents could still visit. At the parents' request, she scheduled a visit for March 8, 2004. She asked them to arrive an hour earlier to discuss some needed paperwork. The parents agreed, but then did not show up for the visitation or call to cancel. Dixon called their cell phone, but was unable to leave a message because the message bank was full. She also phoned the paternal grandmother in Michigan to try to contact them, but was still unable to contact the parents. Although father had told the agency that they were living with his mother, this proved to be untrue.
 {¶ 9} Her next contact with the parents was on March 23, 2004, when they attended a pre-trial. Dixon informed the parents that their drug screens had tested positive for cocaine. Appellant father questioned the results and said he would do weekly screens to prove he was not using drugs. Both parents submitted urine samples that day; mother's was negative, but father's was again positive for cocaine. Dixon set up random drug screens, but the parents would make various excuses as to why they could not do them. To make it easier for the parents, Dixon then set the screens for Mondays and Thursdays, on visit days. The parents still did not cooperate, and continued to offer excuses, such as that they had forgotten, run out of gas, or did not have ID. Out of thirteen requested screens, the parents appeared for two. Dixon said that eventually she stopped asking them to submit to screens.
 {¶ 10} Dixon also stated that she set up approximately 30 one-hour visitations between the parents and Ella. Father attended 15 of the available visits; mother attended 23, but was often at least 20 minutes late. On three occasions, the parents did not come because they were in jail when their bonds were revoked for failure to appear; two others were because of related criminal court hearings. The parents also never provided the requested medical records for Ella. Mother stated that she was a citizen of Norway and that Ella had been born outside the United States. Dixon said she eventually received medical information from a Michigan clinic where Ella was seen when she was 12 days old which indicated Ella had been born in Oklahoma. There was no record of any further medical care, and Ella began receiving her immunization shots while she was in foster care.
 {¶ 11} Dixon also requested medical records for father, to verify that he had been treated for cancer, but father refused to sign a release. After the parents were ordered to participate in the mental health diagnostic and substance abuse assessments, Dixon followed up twice, referring the parents to SASI (Substance Abuse Services) and The Zeph Center, explaining to the parents that the services were free for indigent persons. The parents, however, never complied with the order for assessments.
 {¶ 12} Finally Dixon testified that a paternal aunt has custody of Ella's three siblings who were permanently removed from the parents in Michigan. Several relatives were being considered for Ella's permanent placement, including a maternal grandmother who lives in Norway.
 {¶ 13} The trial court denied defense counsel's motion to withdraw, retaining her to continue representation even in the parents' absence. Counsel for the parents stated that although mother had called at 8:30 that morning saying she was coming to court, the parents failed to appear. The parents had also not provided her with any documents helpful to their defense. Since the parents did not appear and could not be contacted, their counsel was unable to present any evidence or testimony on defense. The guardian ad litem ("GAL") testified that after observing Ella, he noted signs of withdrawal from crack cocaine. The GAL arranged for a special assessment by Early Intervention, which also concluded that Ella was showing signs of drug withdrawal. The GAL opined that Ella was neglected by and in grave danger while in the care of her parents.
 {¶ 14} By clear and convincing evidence, the trial court adjudicated Ella to be dependent and neglected. The court also found that since the filing of both the first and second complaints, the agency made reasonable efforts at reunification which were not successful. After a short recess, the court then proceeded to disposition.
 {¶ 15} LCCSB presented three witnesses at the dispositional phase. An apartment manager testified that on April 6, 2004, the parents had filled out an application to rent an apartment at her complex and moved in that same day. Although they paid the $100 deposit and $116 in prorated rent, they had not paid rent since that time. At the time of the disposition hearing, three months after the initial rental, the parents were in process of being evicted, with final eviction to take place on July 20, 2004.
 {¶ 16} The manager also noted that electric service to the apartment had been shut off for failure to have the service put in their names. The electrical box at the back of their apartment had been broken into and the electric had been turned back on. The manager alleged that another tenant saw the parents breaking into the box. Toledo Edison repaired the lock on the box, adding another piece of metal and two locks. Within three to four days, the box was again broken into. The box was again locked up completely, and has not been tampered with since. The manager said she had recently seen the parents walking up to their apartment, but had not had any conversations with them about the electric shut-off.
 {¶ 17} The second witness, Jessica Rodebaugh, was the manager of the Crown Inn Hotel. She stated that the parents rented a room, a VCR, and some movies on March 11, 2004. When the parents did not check out or return the VCR and movies, Rodebaugh made a police report. The hotel did not pursue any criminal action. Later, on June 7, 2004, mother checked in for four days, paying $46.56 in cash each night. The manager described mother as "fidgety" and unable to carry on a coherent conversation. Mother looked tired, anxious, and unwell. The manager also saw a man with her that she thought was father. When the parents left, housekeeping found a "Brillo wad just tore up" and an "ink pen without the ink * * * [with] stuff all over it." Rodebaugh said from past experiences, she recognized these as items used "for drugs."
 {¶ 18} Heather Dixon, the ongoing caseworker, testified that Ella required physical therapy for gross motor skill delays and special medical needs. She is pone to numerous ear and upper respiratory infections, needing a breathing machine at times. Based upon the parents' long standing substance abuse and mental health issues, pending criminal charges, unstable housing and employment histories, the case plan goal was permanent custody to LCCSB. Dixon also noted that the parents lacked commitment to Ella and had lost custody of their three older children in Michigan for the same conditions alleged in Ella's case. She noted that in cases where parents decide to get help for their substance abuse issues and show progress, the agency recommends them for other programs and could dismiss a complaint for permanent custody. In this case, even after being encouraged several times to initiate the assessment services, the parents failed to take steps to help themselves.
 {¶ 19} The GAL also testified that his attempts to communicate with the parents had been unsuccessful. He said that father, in fact, "wanted nothing to do with me." The GAL noted that his investigation revealed the parents had a criminal history involving cocaine possession in Florida in 1998 and other criminal activity by father in "numerous states." The GAL could find no evidence of any past stable housing. The GAL also recommended permanent custody be granted to LCCSB.
 {¶ 20} After considering all the testimony and evidence presented, the trial court awarded permanent custody to LCCSB pursuant to R.C.2151.414(D). The court found, by clear and convincing evidence, that, pursuant to R.C. 2151.353(A)(4) and R.C. 2151.414(E)(4) and (16), the "the minor child cannot, and should not, be placed with either of the parents within a reasonable period of tim3., and that pursuant to ORC 2151.414(D) [sic] * * *."
 {¶ 21} The parents now appeal that judgment, setting forth the following sole assignment of error:
 {¶ 22} "The trial court erred in finding that there were reasonable efforts made by Lucas County Children Services Board when there were no efforts made by Lucas County Children Services Board and said finding is against the manifest weight of the evidence."
 {¶ 23} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. Santosky v.Kramer (1982), 455 U.S. 745, 759. An appellate court's review of a trial court's decision finding clear and convincing evidence is limited to whether competent, credible evidence exists to support the trial court's factual determinations. In re Starkey, 150 Ohio App.3d 612,2002-Ohio-6892, at ¶ 16; In re Rodgers (2000), 138 Ohio App.3d 510,520.
 {¶ 24} Whenever a trial court removes a child from the child's home or continues the removal of a child from the child's home, it must determine whether the agency has made reasonable efforts to prevent the removal, or to eliminate continued removal, or to make it possible for the child to return home. Starkey, supra, at ¶ 14; R.C. 2151.419(A)(1). "The agency shall have the burden of proving that it has made those reasonable efforts. * * *" R.C. 2151.419(A)(1). A reasonable effort is "an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." In re Weaver (1992), 79 Ohio App.3d 59, 63.
 {¶ 25} Nevertheless, when a children services agency seeks original permanent custody of a child pursuant to R.C. 2151.353(A)(4), the agency is not required to establish a case plan for reunification. In re AaronC. (Jan. 7, 2000), 6th Dist. No. L-99-1021; In the Matter of: Misty B.
(Sept. 17, 1999), 6th Dist. No. L-98-1431; In the Matter of: StephanieH. (Sept. 17, 1999), 6th Dist. No. H-99-009. The "formulation of an initial reunification plan under R.C. 2151.412(A) is mandated only where a court makes a disposition of temporary custody under R.C. 2151.353(A)(2) or (3). The reunification plans necessitated by R.C. 2151.412 pertain only where a child has previously been determined to be dependent, neglected or abused; temporary custody has been committed to a children services board, welfare department or a certified organization; and an order is sought changing temporary to permanent custody." In re Moloney,24 Ohio St.3d 22, 26.
 {¶ 26} Thus, although a children services agency should make a good faith effort to reunite a dependent child with his biological parent, such a reunification plan is not required where it would be futile to implement one. See In re T.K., 9th Dist. No. 03CA0006, 2003-Ohio-2634, at ¶ 16, citing In re Jackson (Aug. 13, 1999), 2d Dist. No. 17514; In reSmallwood (Jan. 26, 1998), 12th Dist. No. CA97-02-041; In re Baby BoyPuckett (Apr. 15, 1996), 12th Dist. No. CA95-07-125, CA95-08-128; Elmerv. Lucas Cty. Children Serv. Bd. (1987), 36 Ohio App.3d 241, 244. When a trial court is considering whether the agency made reasonable efforts to prevent the removal, the issue is not whether the agency "could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." In re Brewer (Feb. 12, 1996), 7th Dist. No. 94-B-28.
 {¶ 27} In this case, the record reveals that, despite the parents' lack of cooperation and failure to comply with court orders, the agency continued to offer them encouragement and services. Contrary to appellants' contentions, the caseworker attempted to contact them and to set up drug screens and assessments. Despite her best efforts, appellants failed to submit to the screenings or to participate in the assessments. Appellants could not be contacted, even by family members or their own attorney. Without the parents' initial cooperation, the agency was prevented from offering any further services. Therefore, we conclude that competent, credible evidence exists to support the trial court's determination by clear and convincing evidence that the agency used reasonable efforts to provide services to the parents.
 {¶ 28} The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Court costs of this appeal are assessed to appellants, pursuant to App.R. 24.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J., Pietrykowski, J., Singer, P.J., Concur.