OPINION
{¶ 1} Amber Spencer appeals from a judgment of the Greene County Court of Common Pleas, Juvenile Division, which granted permanent custody of her son, D.S., to the Greene County Children Services Board ("GCCSB"). The alleged father, Larry Collins, did not participate in the permanent custody hearing and has not appealed the trial court's judgment. (Donald Steineman was originally named as D.S.'s father. However, genetic testing subsequently revealed that he was not D.S.'s biological *Page 2 
father.) For the following reasons, the judgment will be affirmed.
 {¶ 2} GCCSB's involvement with Amber Spencer (fka Amber Nicodemus) began in 2004 due to an incident of domestic violence. On March 10, 2005, GCCSB took custody of D.S. pursuant to an agreement for care signed by Spencer. The agreement was extended twice, and on May 4, 2005, the agency filed a complaint alleging that D.S. was a dependent and neglected child. On May 27, 2005, the court awarded interim custody of D.S. to the agency. The court subsequently adjudicated D.S. to be a dependent and neglected child on July 15, 2005, and it granted temporary custody to GCCSB. Temporary custody was extended twice during the pendency of this case.
 {¶ 3} On October 18, 2006, GCCSB filed a motion requesting permanent custody of D.S. The agency asserted that Spencer had failed to complete her case plan, that she had not made sufficient progress toward stabilizing her mental and emotional well-being, and that she had not taken the steps needed to provide for D.S.'s needs. On May 1, 2007, Spencer filed an motion to extend temporary custody. On June 5, 2007, D.S. filed a motion for an order granting legal custody to his mother with protective supervision by GCCSB. A hearing on the motions was held on June 12, 2007.
 {¶ 4} On June 15, 2007, the trial court granted GCCSB's motion for permanent custody and denied Spencer and D.S.'s motions. The trial court found that Spencer had a long history of using illegal drugs and had repeatedly failed to complete substance abuse counseling, that she had multiple psychological problems, that D.S. required a stable home environment, that D.S.'s "acting out" behaviors increased when *Page 3 
Spencer had unsupervised visitation and when visits were canceled, that thirty-one out of 105 scheduled supervised visits did not occur due to Spencer, that Spencer did not reveal the names of any relatives who might be suitable to care for D.S. and that D.S.'s foster parents expressed interest in adopting him, and that, despite her stated intentions, Spencer's actions demonstrated that D.S. was "a secondary concern." The court concluded that D.S. could not be placed with Spencer within a reasonable period of time, that the agency had undertaken reasonable case planning and diligent efforts to assist Spencer to remedy the problems that caused D.S. to be placed outside the home, and that it was in D.S.'s best interest to be in GCCSB's permanent custody.
 {¶ 5} Spencer appeals, raising two assignments of error.
 {¶ 6} I. "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY CONCLUDING BY CLEAR AND CONVINCING EVIDENCE THAT THE AGENCY HAD PROVIDED REASONABLE CASE PLANNING AND DILIGENT EFFORTS TO ASSIST APPELLANT TO REMEDY CONDITIONS THAT HAVE CAUSED THE REMOVAL OF THE CHILD."
 {¶ 7} In her first assignment of error, Spencer claims that GCCSB failed to make reasonable efforts to assist her in completing her case plan. Spencer asserts that the agency did not adequately investigate placement with a relative, facilitate visitation, assist with obtaining Social Security or SSI benefits, or provide stability for D.S.
 {¶ 8} Prior to an award of permanent custody to a public children services agency, the trial court must determine whether the agency has made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the *Page 4 
continued removal of the child from the child's home, or to make it possible for the child to return safely home." R.C. 2151.419(A)(1). "Reasonable efforts are described as being a good faith effort which is `an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage.'" In re Cranford (July 24, 1998), Montgomery App. Nos. 17085 and 17105, citing In re Weaver (1992),79 Ohio App.3d 59, 606 N.E.2d 1011. "The issue is not whether CSB could have done more, but whether it did enough to satisfy the `reasonableness' standard under the statute." In re Smith (Apr. 12, 2002), Miami App. No. 2001-CA-54. The agency bears the burden of establishing that it made reasonable efforts or that such efforts would be futile. In re Secrest, Montgomery App. No. 19377, 2002-Ohio-7096. When a trial court makes a determination under this statute, it is required to make written findings of fact detailing the relevant services provided by GCCSB to the family and why those services did not enable the child to return home safely. R.C. 2151.419(B)(1).
 {¶ 9} Upon review of the record, we agree with the trial court that GCCSB's efforts were reasonable. Beginning with visitation, Jessica McPherson, Spencer's caseworker from April 2005 until January 2006, testified that she made efforts for Spencer to visit with D.S., including while Spencer was at Women's Recovery in 2005. Between August and November 2005, Spencer had unsupervised visitation with D.S. because her urine tests were negative for drugs. These visits occurred at Spencer's house because Spencer had indicated that she was having a hard time getting to the Greene County Visitation Center in Xenia while living in Fairborn. The visits became supervised again after Spencer began to test positive for drugs in November 2005.
 {¶ 10} Lorris Hayes, Spencer's caseworker from January 2006 until May 2006, *Page 5 
testified that Spencer had supervised visitation from January until approximately April 2006. When Spencer moved to the home of Terry and Barb (last names unknown), visitation occurred at their home.
 {¶ 11} Beth Potts, Spencer's caseworker from May 2006 until March 2007, testified that Amber had visitation with D.S. at the Visitation Center twice per week. Potts stated that she often transported D.S. to and from these visits. Potts recalled that, in March 2007, Spencer had a concern about transportation to the visitation, and Potts responded that "if she'd let me know about the transportation concerns, I would make sure that I could get her to the visits as well." One of the first times that Potts picked up Spencer at her home, Spencer kept Potts and D.S., who was in the car, waiting for more than half an hour.
 {¶ 12} Alisha Brooks, Spencer's caseworker as of March 28, 2007, testified that she attempted to assist Spencer with visitation at the Visitation Center. When Spencer expressed that she had difficulty with transportation, the agency arranged for Purple Taxi to provide transportation for her. In late April 2007, Brooks was notified by Stamper that they were discontinuing visitation due to Spencer missing an excessive amount of visits.
 {¶ 13} Barbara Stamper, Coordinator of the Visitation Center, testified that between April 1, 2005 and March 30, 2007, Spencer canceled twenty-seven appointments and did not show for four appointments. Stamper also indicated that Spencer had three "critical incidents" at the center, which are incidents that would cause alarm or security or safety problems at the center.
 {¶ 14} Spencer was arrested on May 2, 2007 and was placed at Women's *Page 6 
Recovery Center on May 15. Visitation between Spencer and D.S. was suspended on the recommendation of D.S.'s therapist, Dr. Miceli.
 {¶ 15} The record establishes that, until May 2007, the agency attempted to facilitate visitation between Spencer and D.S. When Spencer's behavior made home visitation reasonable, D.S. had unsupervised visitation with her at her home. The agency further attempted to assist with transportation issues when supervised visitation occurred at the Visitation Center. Visitation was suspended in May 2007-after two years of temporary custody — on the recommendation of D.S.'s psychologist. We find no fault with the agency's attempts to assist Spencer with visitation.
 {¶ 16} Lorrie Hayes testified that Spencer's January 13, 2006, case plan required her to continue drug and alcohol treatment through TCN Behavioral Health Services, to obtain a psychological assessment and follow through with the recommendations, and to address D.S.'s medical and developmental needs. Hayes testified that she set up an appointment with Dr. Bromberg for a psychological assessment and the agency provided transportation. Hayes further testified that she twice transported Spencer to TCN so that they could meet with Spencer's therapist, Michael McVay. However, the meetings, which were supposedly arranged by Spencer, did not occur because McVay was not there. Spencer was scheduled to begin intensive outpatient therapy at TCN beginning in April 2007, but she did not attend.
 {¶ 17} The record establishes, and Spencer acknowledges, that she made minimal efforts to complete treatment for drug abuse in 2005 and 2006. Spencer entered Women's Recovery Center twice in 2005 but was discharged both times after *Page 7 
approximately one month due to rule violations. In 2006 and 2007, Spencer repeatedly tested positive for drugs. Although Spencer attended TCN in 2006, she put forth little effort. Spencer testified that she is now committed to completing treatment for drug abuse and counseling; however, her May 2007 placement at Women's Recovery Center was precipitated by another arrest. In addition, Spencer acknowledged that her probation officer visited her at Women's Recovery Center due to her showing disrespect to a staff member. Although Spencer did not satisfy her case plan with regard to drug, alcohol and mental health treatment, that failure cannot be attributed to lack of assistance from GCCSB.
 {¶ 18} As for placement of D.S. with a relative, all of Spencer's caseworkers testified that they were not able to investigate placing D.S. with relatives because Spencer failed to provide information. McPherson testified that Spencer informed her that she had a sister and had no brothers. McPherson did not further investigate Spencer's family or the father's family. The agency investigated Lisa Walton, a friend who petitioned for custody, but Walton but did not appear for the hearing and never received custody. Hayes testified that she also asked Spencer about possible relatives for placement, but Spencer did not provide the names of any potential relatives nor did she provide the names of individuals who could be D.S.'s biological father. Potts testified that she and Spencer talked about relatives, and Spencer showed her photo albums. Although Spencer mentioned that she had a sister, Spencer "didn't want to give [Potts] any information on that particular person" because the sister "wanted to take [D.S.] and adopt him and not have any contact with Amber." Potts never determined who the actual biological father was. Brooks likewise testified that Spencer *Page 8 
never gave her the names of relatives — maternal or paternal — who could be possible placements for D.S. Considering the lack of cooperation from Spencer, the agency's steps to find a residential placement were reasonable.
 {¶ 19} As to income, Potts testified that she did not help Spencer with employment. Potts stated: "I think the employment was kind of below the drug concerns. We were trying to get those under control." She also acknowledged that she did not help Spencer with disability assistance, explaining "I'm not familiar with any disabilities that she had." Although Brooks testified that there may have been a possibility of SSI income based on Spencer's mental health problems, we do not find the agency's actions with regard to income rendered their assistance to Spencer inadequate.
 {¶ 20} We note that Spencer also failed to address the agency's on-going concern about domestic violence. According to the record, Spencer had relationships with Donald Steineman, Noah Spencer (her husband as of October 2006), and an individual named Jeff during the time that the agency was involved with D.S. In 2006, while Spencer was living with Jeff's parents, she went to stay at a domestic violence shelter. In January 2007, Spencer had an incident of domestic violence with her husband, and she had another incident in February 2007 with Steineman.
 {¶ 21} Finally, Spencer argues that the agency failed to provide stability for D.S. while in foster case. She notes that he was removed from his long-term foster home and that he receives visitation with numerous individuals, including his original foster parents, thus resulting in confusion for him. According to the record, D.S. has lived with two foster families. He was removed from the first family in September 2006 due *Page 9 
to an incident of sexual behavior between D.S. and a younger child in the foster home. D.S. has had continued visitation with the original foster family at the recommendation of Dr. Miceli. Although Dr. Miceli testified that D.S. needs a stable, loving environment, we find nothing unreasonable about the agency's placement of D.S.
 {¶ 22} In sum, the record demonstrates that GCCSB has made "reasonable efforts" to assist Spencer in completing her case plan and to eliminate the continued removal of D.S. from his home.
 {¶ 23} The first assignment of error is overruled.
 {¶ 24} II. "APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO REQUEST AN INDEPENDENT PSYCHOLOGICAL ASSESSMENT OF APPELLANT/MOTHER."
 {¶ 25} In her second assignment of error, Spencer asserts that her trial counsel was ineffective by failing to obtain an independent psychological evaluation of her. Spencer notes that Dr. Bromberg's evaluation was performed more than one year before the permanent custody hearing and that Dr. Bromberg had been employed by the agency.
 {¶ 26} In order to demonstrate ineffective assistance of counsel, Spencer must establish that her counsel's representation fell below an objective standard of reasonableness and that she has been prejudiced by her counsel's deficient performance. Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373. "Reversal of a conviction for ineffective assistance of counsel `requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed *Page 10 
the defendant by the Sixth Amendment.'" State v. Hand,107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d. 151, at ¶ 199. Moreover, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 US at 694;Bradley, 42 Ohio St.3d at 142.
 {¶ 27} Dr. Bromberg testified extensively at the evaluation hearing. He stated that he evaluated Spencer on March 9, 2006, March 28, 2006, and July 7, 2006. He described her as "uncooperative" and "not courteous" to staff during her appointments.
 {¶ 28} During the assessment, Dr. Bromberg received a personal history from Spencer. Spencer reported to Dr. Bromberg that her biological mother died when she was three months old and that she was raised by her maternal grandparents. Spencer stated that her grandfather molested her for two years (when she was eleven to thirteen years old), and she went into foster care for a time. Spencer generally had a poor school history and she quit school in the eleventh grade when she became pregnant. Spencer's first child, a daughter, was killed by her father at three months of age. Her second child, a son, was "taken from her" and adopted by a cousin of the father. D.S. was born in February 2001. Spencer subsequently became pregnant with twins but she miscarried.
 {¶ 29} Spencer also reported that she had a criminal history, including violating a protection order and writing bad checks. Charges were also filed for an attempted drug purchase and identity theft.
 {¶ 30} Spencer reported several health issues: spina bifida, asthma, epilepsy, *Page 11 
frequent seizures, and a heart problem. She stated to Dr. Bromberg that she had a history of crack cocaine use, although she indicated that she hadn't used drugs since January 2006 and was treated at Women's Recovery in May 2005. Spencer further stated to Dr. Bromberg that she suffers from bipolar disorder, post traumatic stress disorder, anorexia, and bulimia, and that she cut her wrists when she was fifteen, resulting in hospitalization. Spencer reported that she was taking Xanax (anti-anxiety), Paxil (depression and anxiety), Depakote (bipolar disorder and seizures), and Lithium (bipolar disorder).
 {¶ 31} Dr. Bromberg administered numerous psychological tests: MMPI-2, Millon Clinical Inventory-III, Axis-II Personality Checklist, Rorschach Test, Rotter Incomplete Sentences Test, Post Traumatic Stress Assessment, Substance Abuse Screening Inventory (SASSI), Parenting Stress Index, and Child Abuse Potential Inventory. Dr. Bromberg testified that Spencer over-reported/maximized her symptoms, which was unusual for custody-type assessments. He indicated that most parents try to minimize their symptoms. Several of the tests were invalid because her level of maximizing was too great. The Millon Clinical Inventory-III assessment gave strong evidence of a delusional disorder and suggested a diagnosis of bipolar disorder with psychotic features. Dr. Bromberg indicated he believed Spencer suffered from a personality disorder, which tends to cause enduring relationship problems due to problems relating to people in general. Other tests indicated that Spencer had a mood disorder, depression-type problems, anxiety problems, coping problems, and post-traumatic stress. The Child Abuse Potential Inventory indicated that Spencer had characteristics "similar to active physical child abusers." Her score of 331 was "the *Page 12 
highest [he] had ever gotten on this test." After observing Spencer with D.S., Dr. Bromberg noted that her interaction with D.S. was "warm" and was an "overall positive experience," although Spencer initially did not set limits for D.S. and D.S.'s anxiety level was high.
 {¶ 32} Dr. Bromberg concluded that Spencer "has an extremely unstable emotional functioning level. She's not able to focus on taking care of other people because she is so emotionally disturbed herself." He stated that Spencer was a risk to herself and to a child. He indicated that she required long-term relationship counseling and medication, and that is was "way too early to be able to even consider" her effectively parenting a child. He estimated that, with constant monitored, intensive treatment, Spencer could be able to parent a child in one to five years.
 {¶ 33} Without question, Dr. Bromberg's testimony was unfavorable to Spencer. However, there is no evidence that another psychological evaluation would have produced significantly different results. The basis for much of Bromberg's testimony regarding Spencer's history was corroborated by Spencer. In particular, Spencer testified that she was living at Women's Recovery Center due to her drug use, and that she is receiving therapy for coping skills, anger management, domestic violence, parenting skills, and relapse prevention. Spencer acknowledged that she was taking medication for epilepsy, anxiety, stress, and bipolar disorder.
 {¶ 34} Moreover, as emphasized by the GCCS, Dr. Bromberg's assessment was only one factor in the court's decision to grant permanent custody to the agency. As indicated above, Spencer consistently failed to address her substance abuse problems and domestic violence issues, which are significant impediments to *Page 13 
reunification. Spencer missed numerous visits with D.S., and her residence changed numerous times between March 2005 and June 2007, including brief stays at a domestic violence shelter, Women's Recovery Center, and jail. Although Spencer testified that she was committed to completing her substance abuse treatment and counseling, her history in these areas casts serious doubt on her commitment. At the time of the hearing, Spencer had completed twenty-nine days at the Women's Recovery Center, and she had at least sixty days more. Viewing the evidence in its entirety, we find no reasonable probability that a psychological evaluation by an individual of Spencer's choosing would have altered the outcome of this proceeding. Accordingly, Spencer has failed to demonstrate that her counsel rendered ineffective assistance by failing to obtain an independent psychological assessment.
 {¶ 35} Finally, our conclusion is not altered by In re Stanley (Dec. 7, 1993), Franklin App. No. 93AP-972, which Spencer cites in support of her assertion that her counsel should have obtained another psychological evaluation. In In re Stanley, a case also involving the termination of a parent's parental rights, the trial court granted the children's services board's request for a psychological examination of the parent, pursuant to Juv.R. 32(A), but denied the parent's motion for her own psychological expert and the funds to employ such an expert. The Tenth District found this to be error, stating: "Where the juvenile court grants the state's request for a psychological examination of an indigent parent to be performed by an examiner selected and paid by the state [FCCS], the parent is entitled to an expert of his or her own. Funds to employ her own psychologist should have been awarded appellant in order to afford her a meaningful opportunity to rebut the allegations of FCCS's expert." *Page 14 
 {¶ 36} Here, Spencer's evaluation by Dr. Bromberg was required by the January 2006 case plan, and it was not ordered by the court pursuant to Juv.R. 32(A). Moreover, In re Stanley does not appear to stand for the proposition that independent psychological assessments are required under all circumstances. Put differently, although fairness may have required that the mother in In re Stanley be afforded the same favorable treatment as the CSB on her motion for her own expert, In reStanley does not say or even suggest that a parent's lawyer is necessarily ineffective for not moving for an independent expert. We find In re Stanley to be inapposite.
 {¶ 37} The second assignment of error is overruled.
 {¶ 38} The judgment of the trial court will be affirmed.
 BROGAN, J. and DONOVAN, J., concur. *Page 1