**In re WEAVER.**

[Cite as *In re Weaver* (1992), 79 Ohio App.3d 59.]

Court of Appeals of Ohio,
Butler County.

No. CA91–07–118.

Decided March 30, 1992.

60

John F. Holcomb, Prosecuting Attorney, and *Kathleen Romans,* Assistant Prosecuting Attorney, for appellee Butler County Children Services.

*Richard Paul Michaelson,* for appellant Carmen Weaver.

*Lyn A. Cunningham,* for appellant Michael Tucker.

*Harry B. Zornow,* guardian *ad litem.*

JONES, Presiding Judge.

Appellants, Michael Tucker and Carmen Weaver, appeal an order of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of appellants' minor child, Demartez Weaver, to the Butler County Children Services Board ("BCCSB") and divesting appellants of their parental rights, duties, and obligations.

Demartez Weaver was born on June 19, 1989, at Fort Hamilton–Hughes Hospital in Hamilton, Ohio. At birth, the child tested positive for symptoms of cocaine addiction as a result of Carmen Weaver's use of crack cocaine during her pregnancy. On June 21, 1989, BCCSB filed a complaint alleging that Demartez Weaver was a dependent child. By this time, however, Carmen Weaver had removed the child from the hospital and neither she nor the child could be located.

Nearly three weeks later, on July 10, 1989, Weaver returned the child, who was now seriously ill, to the hospital, and simply disappeared. Upon the child's release from the hospital, neither Weaver nor Michael Tucker, the child's father, could be located. Because of the child's chronic medical problems, BCCSB placed Demartez in a "therapeutic foster home," a home where the foster parents were specially trained in dealing with high-risk children. Because of his medical condition, the child must be placed on a respiratory machine two times a day or, when especially congested, every two hours, and must also be placed on an inhaler four times a day. Because Demartez is susceptible to choking, the foster mother was required to perform CPR on the child on six different occasions over a two-year period.

On July 17, 1989, the juvenile court found Demartez to be a dependent child and awarded temporary custody to BCCSB. A case plan document was filed and BCCSB commenced attempts to reunify the child with appellants. Nearly two years later, on May 15, 1991, BCCSB moved for permanent custody, claiming that the child could not be placed with either parent within a

reasonable time and there was no treatment plan which would enable either parent to provide adequate parental care. The juvenile court conducted separate adjudicatory and dispositional hearings on BCCSB's motion in June 1991. In a judgment entry dated June 27, 1991, the court found there was clear and convincing evidence that the child could not be placed with either parent within a reasonable period of time and that it was in the child's best interest to grant permanent custody to BCCSB for purposes of adoptive placement. The court granted permanent custody to BCCSB and divested appellants of their parental rights.

Although represented by separate counsel on appeal, appellants raise identical assignments of error, which claim the following:

Assignment of Error No. 1:

"The trial court erred to the prejudice of [appellants] in finding that the Children's Services Board had made a good faith effort to implement the reunification plan."

Assignment of Error No. 2:

"The trial court's finding that the minor child could not be placed with [appellants] within a reasonable length of time was against the manifest weight of the evidence."

In their first assignment of error, appellants assert that BCCSB did not make a good faith effort to implement the reunification plan. Absent such a good faith effort, appellants submit, the juvenile court erred in granting permanent custody to BCCSB.

Carmen Weaver contends that the absence of good faith is demonstrated by the fact that she did not receive a copy of the case plan document until March 1991, and that the fifteen weeks between receipt of the plan and the hearing on the permanent custody motion was simply not enough time for her to comply with the plan's provisions. The record reflects that BCCSB was unaware of Weaver's whereabouts from July 1989 until November 1990, when Weaver was incarcerated at Marysville, Ohio, on criminal charges. Following her release from prison in November 1990, Weaver informed BCCSB that she had been admitted to Talbert House in Cincinnati for drug rehabilitation. The BCCSB caseworker decided not to send a copy of the plan document to Weaver at that time because she believed Weaver would not be able to comply with the plan requirements while completing her responsibilities in the Talbert House program.

BCCSB informed Weaver that a semi-annual review of the case plan was scheduled in December 1990, and advised Weaver she should attend. Weaver failed to appear at the semi-annual review. The plan required Weaver to

participate in a Development of Living Skills ("DLS") Program designed to assist her in developing the requisite basic skills to care for Demartez. Weaver cancelled nine of her twelve scheduled appointments in the program. In addition, she failed to complete the psychological evaluation required by the reunification plan; Weaver left during one scheduled session, was one and one-half hours late for and left midway during a second session, and never appeared at a third scheduled session.

With respect to the child's father, the record reflects that Michael Tucker is the father of Weaver's other son, Damykle, and has fathered three other children by another woman. Tucker participated in the DLS program as required by the reunification plan and showed some progress. The program was suspended in December 1989, when Tucker was incarcerated, and resumed upon his release from prison. Another suspension occurred during a three-week period in July 1990, when Tucker was again incarcerated. The program was finally suspended in October 1990, due to Tucker's prolonged absences; he never requested a resumption of the program.

That same month, Tucker was convicted of attempted trafficking in marijuana and placed on probation for five years. Tucker's probation terms and the reunification plan both required his participation in a drug treatment program. In November 1990, Tucker called his probation officer and admitted he had been smoking crack cocaine. Tucker was placed in a care unit in Cincinnati but released himself two days later against the advice of a physician. Tucker was in jail from November 13 to November 29, 1990; altogether, he was incarcerated on four separate occasions while on probation. Upon his release, he was again ordered to continue drug counseling and therapy. Nevertheless, Tucker tested positive for cocaine on four separate occasions in April 1991, the last of which occurred only two months before the hearing on the permanent custody motion. On March 21, 1991, Tucker was cited for a probation violation after he was arrested in Hamilton for carrying a concealed weapon and handling weapons while intoxicated.

Tucker argues that BCCSB has not made a good faith effort to implement the reunification plan, pointing out that in another thirty-five weeks he could successfully complete the drug rehabilitation program required by the plan. However, as noted by the prosecutor in closing argument for the juvenile court, such seems an unlikely possibility since there has not been a thirty-five-week period since the child's birth during which Tucker has managed to keep himself out of jail.

This court has previously held that a good faith effort to implement a reunification plan means an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage. *In re Johnson*

(Nov. 21, 1988), Butler App. No. CA87–12–158, unreported, at 5, 1988 WL 124466. A lack of good faith effort is defined as importing a dishonest purpose, conscious wrongdoing or breach of a known duty based on some ulterior motive or ill will in the nature of fraud. *Id.* We believe the record supports a good faith effort on the part of BCCSB. BCCSB and other agencies attempted to provide appellants with those services required by the reunification plan. However, many of these services were discontinued or terminated as a result of appellants' inability to make themselves available. Appellants' criminal backgrounds and at times their apathetic attitudes simply made it impossible to complete the plan requirements. We find no evidence of dishonest purpose, conscious wrongdoing, or breach of duty on the part of BCCSB.

 Turning to the weight-of-the-evidence question, R.C. 2151.414(B)(1) provides that the court may grant permanent custody if it determines by clear and convincing evidence that the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. *In re Halcomb* (Dec. 24, 1990), Warren App. No. CA90–05–035, unreported, 1990 WL 210840. Furthermore, R.C. 2151.414(E) requires the trial court to enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents if, upon considering all relevant evidence, the court concludes, by clear and convincing evidence, that at least one of the eight specific statutory factors exists with respect to each of the child's parents. *Id.* Clear and convincing evidence is that which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. A reviewing court must determine whether the evidence is such to support a high probability or firm belief or conviction that a particular fact has been established or proved. *Id.*

 In the case at bar, it is readily apparent that although Carmen Weaver had only fifteen weeks in which to implement the plan's provisions, she either failed to comply with any requirements during that short time or was indifferent in her efforts to do so. Weaver herself waited almost one and one-half years before officially contacting her BCCSB caseworker to inquire about regaining custody of Demartez.

The record also reflects that Michael Tucker has been unable to establish the stable lifestyle which caseworkers noted was necessary to fulfill the child's needs for constant attention and care. Tucker admittedly showed signs of progress in his DLS program, displayed a desire to have custody of Demartez, and complied with other plan provisions. Nevertheless, the record also shows that Tucker has been unable to control his use of illicit drugs,

which has resulted in his repeated incarceration and the prolonged periods of "unexplained absences" with which caseworkers were concerned.

Neither parent has been able to demonstrate the ability to provide the "constant flow of paternity" needed by the child. While Tucker appeared capable of providing care for a child with "normal needs or health," it is all too apparent that Demartez has special needs and requires medical attention beyond that of a normal child. Regrettably, these needs will continue for some time, and during the two years in which BCCSB has had temporary custody of Demartez, appellants have not demonstrated that they will be able to provide the stable environment necessary to fulfill those special needs. The evidence is such that appellants' chemical dependency or repeated incarcerations prevent them from providing an adequate permanent home for the child. R.C. 2151.414(E)(2) and (7).

Having reviewed the record, we find that BCCSB made a good faith effort to reunify Demartez Weaver with his parents. Furthermore, the record contains clear and convincing evidence to support the juvenile court's determination that the child could not be placed with either parent within a reasonable time or should not be placed with the parents. Accordingly, the juvenile court acted within the child's best interest in granting permanent custody to BCCSB.

For these reasons, appellants' assignments of error are hereby overruled.

*Judgment affirmed.*

KOEHLER and WALSH, JJ., concur.