[Cite as *In re T.S.*, 2020-Ohio-2972.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re T.S.

Court of Appeals No. L-19-1247

Trial Court No. JC 17265215

<u>**DECISION AND JUDGMENT**</u>

Decided: May 15, 2020

* * * * *

Adam H. Houser, for appellant.

Bradley W. King, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Tr.S. ("father"), appeals the October 15, 2019 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating his parental rights and granting permanent custody of his child, T.S. ("the child"), to appellee, Lucas County Children Services ("LCCS"). The trial court also terminated the parental rights of the

child's mother, K.S. ("mother"), who is not a party to this appeal.  For the following reasons, we affirm.

## I.  Background and Facts

{¶ 2} On October 5, 2017, LCCS received a referral alleging that mother and the child both tested positive for cocaine and THC at birth.  LCCS received emergency custody of the child on October 11, 2017.

{¶ 3} On October 12, 2017, LCCS filed a complaint in abuse, neglect, and dependency.  The complaint alleged that mother had received "poor prenatal care," and that mother and the child tested positive for cocaine and THC at birth.  Regarding father, the complaint alleged that he had pending misdemeanor charges of OVI and possession of drug abuse instruments, had eight active bench warrants through the municipal court, and had been convicted of negligent assault in January 2017.  Additionally, LCCS said that it received a referral in June 2017—while mother was pregnant—about a domestic violence incident between the parents, but it closed the referral because it could not find the family.  The complaint also noted that father was "unsure" if the child was his biological child.  The trial court held a shelter care hearing that day and granted LCCS interim temporary custody of the child.

{¶ 4} On November 13, 2017, LCCS filed a case plan with the goal of reunification.  The case plan required father to (1) obtain substance abuse and mental health assessments and follow all of the providers' treatment recommendations, (2) submit to random drug screens, (3) complete a domestic violence batterers' class,

2.

(4) complete a sex-offender-treatment ("SOT") program, and (5) complete an agency-approved parenting class, which required him to "work with an interactive parent educator." Father disagreed with the need for a SOT program, but agreed to the other goals. The trial court approved the case plan on March 1, 2018.

{¶ 5} On November 29, 2017, a magistrate held a combined adjudication and disposition hearing. Father failed to appear, and the court entered default adjudications of abuse, neglect, and dependency. The court also determined that LCCS had made reasonable efforts to prevent the continued removal of the child from the home by referring father for a dual diagnosis assessment, SOT assessment, parenting classes, and a domestic violence batterers' program. The trial court adopted the magistrate's decision on December 12, 2017.

{¶ 6} On April 12, 2018, a magistrate conducted a review hearing. The magistrate found that father was complying with his substance abuse and mental health treatment recommendations and regularly visited the child. The magistrate also found that LCCS had made and continued to make reasonable efforts to prevent the continued removal of the child from the home. The trial court adopted the magistrate's decision on April 23, 2018.

{¶ 7} On July 18, 2018, LCCS filed a motion for permanent custody, alleging that the child could not be placed with either parent in a reasonable time or should not be placed with either parent, and that granting the agency permanent custody of the child was in the child's best interest. In the motion, LCCS said that father initially engaged in

3.

case plan services by participating in substance abuse, mental health, and domestic violence treatment and investigating an agency to conduct a SOT assessment. However, in May 2018, he relapsed with alcohol and left all of his treatment programs. LCCS alleged that father had a history of alcohol and cocaine abuse and was convicted of gross sexual imposition with a minor victim. The child was healthy and doing well in her foster placement. The agency argued that granting it permanent custody was in the child's best interest because she needed a permanent plan for adoptive placement and planning.

{¶ 8} On October 3, 2018, a magistrate held an annual review hearing. The magistrate found that LCCS had made and continued to make reasonable efforts to end the continued removal of the child from the home, including "SOT assessment, parenting, DV. non-compliant." The trial court adopted the magistrate's decision on October 9, 2018.

{¶ 9} On October 12, 2018, LCCS filed its annual review. In it, the agency noted that father did not follow through with recommendations for psychiatric, mental health, and intensive outpatient services; did not attend domestic violence classes; needed to address his substance abuse issues before he could be referred to parenting classes; and had not visited with the child since he had a relapse in August 2018. Although LCCS had referred father for a SOT assessment, the person who did those assessments left the assessing agency before assessing father. Regardless, father needed to address his substance abuse issues before engaging in a SOT program. The review also said that

4.

father had not been in contact with the agency since his relapse, but that the caseworker had recently learned that father was at an inpatient substance abuse treatment facility. The trial court approved the review on December 12, 2018. Based on the case plan and the information in the annual review, the court found that LCCS had made reasonable efforts to reunify the family.

{¶ 10} On April 10, 2019, LCCS filed a semiannual review. In it, the agency noted that father had completed an inpatient substance abuse treatment program, was engaged in mental health and substance abuse counseling, was taking medicine to manage his mental health issues, and had a negative drug screen. Father was almost finished with domestic violence classes and was preparing to start parenting classes. He was consistently visiting with the child, and the visits were going well. The caseworker also gave father another referral for the SOT assessment that the case plan required. The trial court approved the review on May 2, 2019. Based on the case plan and the information in the semiannual review, the court found that LCCS had made reasonable efforts to reunify the family.

{¶ 11} On July 8, 2019, the trial court held a pretrial at which LCCS summarized father's progress. According to the caseworker, father had been attending outpatient substance abuse treatment groups, but had stopped going at the end of May 2018. The service provider said that father would have to restart the outpatient groups because of the length of time he had been away. Father was also homeless. Father told the court that he was working and anticipated having enough money for a deposit on an apartment later

5.

that week. He also thought that he might be able to resume his outpatient groups without having to start over. The parties were hopeful that they could resolve this case by returning legal custody to father with LCCS providing protective supervision.

{¶ 12} By September 25, 2019, the date of the scheduled permanent-custody hearing, father had not complied with the case plan goals to an extent that LCCS felt comfortable recommending that father regain legal custody of the child, so the parties proceeded with the hearing.

{¶ 13} At the permanent-custody hearing, LCCS presented the testimony of Amber Fischer, the family's ongoing caseworker, and the guardian ad litem ("GAL"). Father presented the testimony of Christopher Salazar, his case manager at Midwest Recovery Center ("Midwest"), and Jim Fuller, a "housing TAK [sic]" at Midwest. Father also testified in his own behalf. The following facts were adduced at the hearing.

{¶ 14} Fischer testified that LCCS received a referral about mother and the child when both tested positive for cocaine at the time of the child's birth in October 2017. Father and mother were married at the time the child was born, so father was presumed to be the child's biological father. Father said that he was unsure of the child's paternity, however, so he asked the trial court for genetic testing twice. The trial court denied both motions.

{¶ 15} According to Fischer, father had a history of involvement with LCCS. He was married to mother when LCCS removed from her care (and eventually obtained permanent custody of) two children who were not father's biological children.

6.

Additionally, in 2005, father was named as the alleged perpetrator of a sexual abuse incident against his 14-year-old stepdaughter. LCCS's investigation resulted in a finding of "indicated." And in June 2017, LCCS received a report that father hit mother—who was six months pregnant with the child—in the mouth and stomach. Mother received medical care and stitches as a result of the incident.

{¶ 16} Through her involvement with the family, Fischer also knew of an incident in 2010 where father was hospitalized with auditory hallucinations and homicidal thoughts toward his mother. At that time, father admitted to using crack cocaine "since the age of 19 on and off for the past 20 years," although he reported a four-year period of sobriety. Father also said that crack and alcohol intensified his auditory hallucinations.

{¶ 17} LCCS's concerns about father at the time the child was removed from the home included substance abuse, mental health issues, and domestic violence. Initially, father did not participate in case plan services. Early in the case, Fischer took mother and father to observe a session of the trial court's drug court program. Father slept through most of the session and then told Fischer that he was not interested in participating in drug court. Fischer also reported that father was arrested in November 2017 for domestic violence against mother for reportedly punching mother while in a car at a gas station. After arresting father, police found a crack pipe in the car. Fischer said that a temporary protection order was issued for the benefit of mother and that father was incarcerated

until February 2018 as a result of his conviction.[1] The records from some of father's treatment providers indicate that father reported that he was in jail from November 2017 to February 2018.

{¶ 18} Father first engaged in mental health and substance abuse services after he was released from jail in February 2018, but his participation was sporadic and he frequently changed treatment providers. First, in February 2018, father was assessed for substance abuse and mental health issues at Zepf Center ("Zepf"). Fischer reported that his treatment recommendations included detox, an evaluation for medicine-assisted therapy, recovery housing, and partial hospitalization groups, but the Zepf assessment was not included in the treatment records that LCCS submitted as evidence. By the end of February 2018, father completed a 13-day detox at Zepf and moved into the recovery housing program at Empowered for Excellence ("EFE"). He was providing clean drug screens at this time. Although father was using EFE for his substance abuse treatment, he continued to receive psychiatric services through Zepf. Father continued with his

---

[1] LCCS admitted into evidence the docket sheets from father's criminal cases. These records do not support Fischer's testimony. Although father has a misdemeanor charge from November 2017, the docket sheet shows that he was charged with possession of drug paraphernalia, which was later reduced to disorderly conduct, and was sentenced to a fine and court costs, which the municipal court suspended. Father was held in jail for two days following his arrest, but was released on a recognizance bond and did not return to jail. The records in LCCS's exhibit do not show a domestic violence charge from November 2017, a temporary protection order in favor of mother, or that father was jailed for several months because of the November 2017 incident.

treatment, and completed an assessment for entry into a domestic violence batterers' class at Unison. Overall, father was compliant with the case plan through April 2018.

{¶ 19} In May 2018, however, father relapsed with alcohol and left both the housing and treatment programs at EFE.

{¶ 20} Father was unsuccessfully discharged from the domestic violence class at Unison in June 2018 after he missed three sessions without calling. Father attended only two of 18 classes before being discharged.

{¶ 21} LCCS filed its motion for permanent custody in July 2018. When it did so, father was homeless and unemployed. He admitted to using alcohol, marijuana, and crack cocaine and was struggling with his mental health issues. Although father told Fischer that he was not living with mother, she believed that mother and father were together because mother would regularly call Fischer from father's cellphone.

{¶ 22} Also in July 2018, father went to A Renewed Mind for a substance abuse and mental health assessment. The agency recommended partial hospitalization, intensive outpatient, and psychiatric services. At some point shortly after his assessment, father stopped treating at A Renewed Mind and returned to EFE.

{¶ 23} Father left EFE again in August 2018 and admitted to Fischer that he continued to use alcohol, crack, and marijuana. His visits with the child during this time were "very sporadic." Fischer said that she was unable to contact father in August, but said that someone from the visitation department called father when he missed a visit and talked to mother, who said that father was incarcerated.

9.

**{¶ 24}** Fischer was unable to contact father in September 2018, but learned that father had been arrested on open warrants and spent ten days in jail.

**{¶ 25}** In October 2018, father contacted Fischer. He told her that he had been living with mother and they were using crack together. However, mother had gotten violent with him, so he left her and filed for divorce. When father left their home, he went to a homeless shelter. The shelter sent him to Arrowhead Behavioral Health ("Arrowhead") for detox, which he successfully completed. During this period, father was not taking his psychiatric medicine because he missed several of his appointments at Zepf.

**{¶ 26}** After finishing detox at Arrowhead, father returned to EFE. Father stayed with the program at EFE from late October 2018 until early January 2019. He progressed to phase two of the program, but was terminated for breaking the rules. According to Fischer, father reported that he was terminated from EFE for falling asleep in group and refusing to give his phone to a staff member.

**{¶ 27}** In December 2018, father reenrolled in domestic violence classes at Unison, returned to his psychiatric treatment at Zepf, and began regularly taking his psychiatric medicines.

**{¶ 28}** In mid-January 2019, when he was terminated from the program at EFE, father called Salazar, a care coordinator at Midwest, and Salazar helped father reenter treatment and the sober living program at Midwest. According to Salazar, father reported that he was discharged from EFE for "[s]omething to do with his schedule that he

10.

didn't—he was at a meeting, and they were saying that that was not on his schedule, which it was * * * so they discharged him."

{¶ 29} While father resided at Midwest's sober living program, Salazar was father's housing coordinator. During that time, Salazar said, father followed all of the rules, attended his groups, and followed his treatment plan. Salazar continued as father's case manager after father left the sober living program. Father continued to do "everything requested from [Salazar] and through any courts or anything that was given to him. Anything that he was requested to do, he was on it and took care of it." Salazar saw father three times a week, and father's attendance was "perfect." Fuller, a "housing TAK [sic]" at Midwest, was responsible for overseeing the cleanliness of father's room, ensuring that father made it to appointments, and ensuring that father provided urine for his random drug screens. He testified that father was compliant with everything Fuller asked of him and never showed anger or resentment toward Fuller. Fuller thought that father "was a role model for other residents that lived [at Midwest]."

{¶ 30} In April 2019, father successfully completed the domestic violence classes at Unison and the intensive outpatient program at Midwest.

{¶ 31} In May 2019, father's divorce from mother was finalized. Father also completed a parenting program through Brothers United. The parenting classes did not have an interactive component, though, which is something that was required by the case plan and that LCCS "recommend[s] so that the provider can see the parent interacting with the child." Additionally, father had surgery to correct his sleep apnea, which

11.

resulted in him being prescribed narcotics. He went to a planned detox at Midwest following the surgery. However, at the end of May, father left the sober-living facility at Midwest and moved to St. Paul's homeless shelter. Fischer reported that father went to the shelter because he was trying to get housing through Neighborhood Properties, Inc. ("NPI"), which required that he be homeless.

{¶ 32} In June 2019 (after he left the sober-living facility), Fischer said that father stopped attending his treatment groups at Midwest. Salazar recalled that, although father missed some appointments, "it was all approved by the clinical team so he could do what he needed to do for his legal obligations." LCCS did not submit any treatment records from Midwest, so father's attendance history is not in the record. Father also skipped his psychiatric appointment at Zepf. And in mid-June, father was kicked out of St. Paul's shelter for violating the rules by smoking a cigarette in the bathroom, which he denied doing. Also in June, father got a job doing janitorial work at The Source. Fischer did not know what father's monthly income was.

{¶ 33} In July 2019, father returned to Midwest for outpatient substance abuse groups and individual counseling sessions, and remained compliant with his substance abuse treatment through the time of the permanent-custody hearing. Father also returned to Zepf for psychiatric treatment. After being kicked out of St. Paul's shelter, father temporarily moved into his mother's one-bedroom apartment while he worked with his case manager at Zepf or Midwest to find housing.

12.

{¶ 34} Also in July, father completed the SOT assessment required by his case plan. Although the assessor did not believe that father needed a SOT program, he recommended that father's psychiatric treatment at Zepf include anger management "despite [father's] claims and desires to the contrary" and that father continue with substance abuse treatment, including "maintenance therapy (e.g., AA, NA) in perpetuity." The assessor also "encourage[d]" LCCS to "maintain supervision and support [of father] for a long time to come."

{¶ 35} In September 2019, father successfully completed outpatient treatment at Midwest. A progress note from September 4, 2019, showed that father was compliant with his treatment. Father chose to continue case management and individual therapy services at Midwest even after completing the substance abuse treatment programs. In a note dated September 25, 2019 (the date of the permanent-custody hearing), father's therapist at Midwest said that father "continues to remain engaged in individual therapy at this time for ongoing management of symptoms related to his mental health and as part of relapse prevention." Salazar testified that father was required to take drug screens two or three times a week from January to September 2019, and every screen was negative.

{¶ 36} In addition to father's substance abuse and mental health issues, he was homeless after leaving mother. Fischer screened father for placement in LCCS's family unification housing program, but father did not qualify because of his criminal and eviction history. Fischer also connected father with a community advocate who helped him apply for housing through NPI. In addition to working with Fischer, father was also

13.

working with one of his case managers (Fischer did not say from which agency) to obtain housing. Father applied to the Lucas Metropolitan Housing Authority, but his application was denied because he had an eviction in his past. He also applied to Madonna Homes, but his application was denied because of his criminal history. When these options did not work out, Fischer suggested that father consider renting an unsubsidized apartment. In July 2019, he found an apartment, but before he rented it, he learned that his potential roommate had substance abuse issues, so he chose not to rent the apartment. Father did not have housing at the time of the permanent-custody hearing. He had been approved for housing through NPI, but was on a waiting list, and Fischer did not know how long his wait would be. According to Fischer, "in May and June and July [2019, father] was talking about getting housing through NPI and that he thought it was going to be happening soon, however, that has not happened."

{¶ 37} For the first year that the case was open, father's visits with the child were fairly inconsistent. He went to one supervised visit in November 2017, but did not attend another visit until February 2018 because of his incarceration. He missed some visits in June, July, and August 2018, and was removed from the visit schedule in September 2018 because he missed three weeks of visits in a row. Beginning in October 2018, father was "fairly consistent, occasionally missing visits at times."

{¶ 38} The primary concern with father's visits was that he would often fall asleep. Fischer was aware that father had sleep apnea, which can cause sleepiness, but she said that he was being treated for the condition and had surgery in May 2019 to fix

14.

the problem. Even after his surgery, he continued to fall asleep during visits. LCCS documented father sleeping during visits on five occasions between June and September 2019, including the visit two days before the permanent-custody hearing. On one of those occasions, the child got out of the visit room and a staff member had to wake father. LCCS staff members talked to father about sleeping during visits. Father took their suggestions, but Fischer was concerned about the child's safety if visits were moved to a location in the community and no one was supervising the visits. The GAL observed father with the child during three visits at LCCS, and said that he was appropriate with the child, observing her and making sure that she was safe.

{¶ 39} During the hearing, Fischer summarized father's progress with his case plan. She believed that father had made progress with his sobriety, which was a "huge improvement" for him, and said it was important for father to be consistent with his mental health treatment to help him maintain his sobriety. But, "over the course of the past two years there has been a lot of back and forth with treatment, * * * and he's gone back and forth with his stability and remaining consistent with his mental health. Those things concern me in what his ability would be to then manage his child and her special needs."

{¶ 40} Fischer acknowledged that father had been mostly "on track" with his case plan since October 2018, and at the time of the permanent-custody hearing, he had completed domestic violence classes, was attending to his mental health needs, had completed several substance abuse treatment programs, had completed a parenting

15.

program at Brothers United, and was voluntarily attending another parenting program at The Source. The only "main" service that father had not completed was finding housing. Regardless, Fischer thought, based on the recommendations in the SOT assessment, that father should also attend anger management classes. And she wanted to see his interactions with the child observed by a parenting coach. Father had not done an interactive parenting class yet, though, because of the "instability throughout the course of the case with father's own mental health and substance abuse and things like that."

{¶ 41} Despite father's progress, LCCS decided to pursue permanent custody. Fischer summarized the agency's decision:

> the biggest reason is due to the instability throughout the course of the past two years. He has been in and out of service providers, in and out of treatment. And he has made some really good progress for himself as a human being and as a person. He's clean and sober now which I commend him for. However, due to the lack of instability [sic] and the amount of needs that dad has for himself, I have not seen him be able to demonstrate that he could meet additional needs of his child. And that's based on decisions that he has made throughout the course of the case that has prolonged things to the point that we've never been able to look at less restrictive visits. Because there has been—there's been progress, and then there has been a decline and that pattern has kind of continued throughout the course of the case which has made it difficult for us to move forward

with seeing if he is able to parent [the child] full time and meet the needs of her and her special needs.

Additionally, father's unaddressed need for anger management gave Fischer "concerns" for a "young infant child who can be very challenging at times." Father's lack of stable housing was also a concern because "there's nowhere today that we can send the child home to." And father's frequent changes of service providers and choices that got him terminated from programs—which caused many of the delays in the case—negatively affected Fischer's perception of his commitment to the child because the "lack of instability [sic], it effects his role as a parent and if he would be able to consistently meet the ongoing needs of his child who is currently very young, not able to protect herself from any sort of abuse or neglect due to her young age."

{¶ 42} Regarding the child, Fischer said that she had several special needs, including adaptive, fine motor, receptive and expressive language, and cognitive delays. A developmental specialist was working with the child in the foster home and at daycare, and she was on a waiting list for speech therapy. Fischer did not believe that father was capable of caring for the child's special needs, including getting her to necessary appointments and treatments, because of the "pattern of instability with his own services." Fischer also noticed that the child was unusually shy and lacked the bond Fischer normally had with children she worked with for years, although the child interacted well with the other children in the foster home. The GAL described the child

as very active and "in perpetual motion" and echoed Fischer's sentiment that the child is shy around adults that she does not know well.

{¶ 43} The child was placed in her foster home shortly after birth. Fischer said that the child was doing "very well" in the placement, which was a potential adoptive placement. She was bonded with the foster parents and their children and all of her needs were being met.

{¶ 44} Fischer believed that granting LCCS permanent custody of the child was in the child's best interest. Fischer said that this "was not an easy decision to come to because I think [father] has worked really hard to get his life on track. However, I think this is something that he's going to have to actively continue to work on, and he has so many needs that he's going to have to stay consistent and engaged to maintain stability for himself."

{¶ 45} The GAL also believed that awarding LCCS permanent custody was in the child's best interest. The GAL commended father for his year-long sobriety and divorcing mother. However, the GAL still thought permanent custody was in the child's best interest so that she could have a "safe, stable placement in a nurturing, forever home." In her report, filed on February 26, 2019, the GAL said that

> [a]lthough Father loves [the child] and wants to be reunited with her, he
> presents several serious risk. Father has a history of substance abuse and
> relapse. He has been diagnosed with schizo affective [sic] and major
> depressive disorders that require psychiatric medications. Father remains

18.

married to Mother and reports that he could be the Father of her unborn child. Father also lacks permanent housing and employment. Father is unable to provide the stability or the nurturing a young child needs.

Nothing that the GAL observed from February to September of 2019 or heard at the permanent-custody hearing changed her opinion that granting permanent custody to LCCS was in the child's best interest. In fact, father's testimony at the hearing that he lacked a plan for the child "verified" the GAL's decision that permanent custody was in the child's best interest. Overall, the GAL thought that it was "commendable that [father] has made gains for himself, but there needs to be a well thought out plan for the child."

{¶ 46} In his testimony, father explained some of his background to the court. He told the court that he had 10 children, two of whom he had custody of from the time they were 9 years old until they were 18 years old. He had "been there for all of my kids" and was still involved in his children's lives.

{¶ 47} Father was married to mother until May 2019. He left mother because she was unfaithful and would be gone for several days at a time "on top of the fact of the arguing and different things like that," and father "just got sick of living that way."

{¶ 48} Father was incarcerated "several" times during the two years that LCCS had an open case with the family. He claimed that his incarcerations were "a lot of times due to arguments" with mother, who he characterized as manipulative and "a big liar." He did not outright deny that he had been violent with mother, but said that "[w]e argue, and if she put her hands on me, I would, you know, try to restrain her."

19.

{¶ 49} Father said that he had been working with LCCS since October 2017 and confirmed that he had completed many of his case plan goals. He completed domestic violence classes at Unison. Father said that the parenting classes LCCS referred him to "were no longer in service," so he chose to attend a "fatherhood program" through Brothers United. He was scheduled to successfully complete the Brothers United program the day of the permanent-custody hearing.

{¶ 50} Father did not attend any anger management classes and disagreed with the anger management recommendation in the SOT assessment. He explained away the recommendation by saying that he got "a little bit of angry" during the assessment because the assessor was asking "silly questions," trying to "trip me up in words," and "act[ing] like he didn't understand what I was saying as far as me explaining what had happened * * *."

{¶ 51} As far as the incident that led LCCS to require a SOT assessment, father said that it was the result of a "manipulation-type story" and that his girlfriend's mother "coerced" his girlfriend's daughter to say that father "was messing with" the daughter. Father claimed that the incident "never happened" and that LCCS "cleared" him.

{¶ 52} Regarding his mental health issues, father said that he chose to go to Zepf (i.e., LCCS did not refer him) for his psychiatric care. He began going to Zepf when he "got out of jail," presumably in February 2018. He saw a psychiatrist once a month, but was not engaged in counseling.

20.

**{¶ 53}** Regarding his substance abuse issues, father said that he first went to Midwest for substance abuse treatment, but "ended up being kicked out." He admitted that he had relapsed during the pendency of this case, but in early October 2018, father left mother and, with the help of a counselor, went to Arrowhead for substance abuse treatment.

**{¶ 54}** After Arrowhead, father went to EFE. While at EFE, father was falling asleep in groups due to his sleep apnea. The staff at EFE thought he was falling asleep because he was on his phone all night, so they were going to take his phone as punishment. This was not the first time staff had tried to take his phone. Father said the punishment was "petty," that "it was like a mind thing," and that the director was "ego tripping." Father argued with the director, who wanted to take his phone, and told her that she "wasn't going to take my phone. And she said, well, you can leave and I was like, fine." So father left EFE and called Salazar, who took him to Midwest. Father successfully completed substance abuse treatment at Midwest and was still attending classes there.

**{¶ 55}** At the time of the hearing, father continued to address his issues. He had been sober for nearly one year—since early October 2018—and said his longest period of sobriety was four and one-half years, from 2011 to 2015. He volunteered at St. Paul's shelter every morning from 6:00 a.m. until he left for his 1:00 p.m. shift at work. He began volunteering at the shelter as part of the community service hours required to get his driver's license back. He continued volunteering after getting his license because "I

21.

felt like it helped me. And I was appreciative of what they done for me." He attended Narcotics Anonymous meetings daily. Father had a job doing janitorial work at The Source. He was recently promoted and training to be a supervisor. Father was also taking a manufacturing class that would allow him to get his GED and a manufacturing certification. In addition, father was working to restart the handyman service that he ran from 2011 to 2015.

{¶ 56} Father did not have housing. He was living with his mother, where he went when he was kicked out of St. Paul's shelter. Father claimed that he had to leave the shelter because someone had smoked a cigarette in the bathroom before he used it, and the staff person working that night "had some type of problem with" father and "made up this story about me smoking a cigarette, and they went on her word * * *."

{¶ 57} Father was approved for housing through NPI, but was on a waiting list. He had planned on renting an apartment with a roommate, but ultimately did not because the roommate had substance abuse issues and father did not want to deal with the roommate's issues. He said he initially agreed to living with the roommate because he felt pressured by LCCS to rent an apartment as "part of the case plan was to get a place." He believed that his income was sufficient for him to live on his own, but that his background was preventing him from finding housing. Specifically, he said that he had not gotten a place because of "dealing with my ex-wife and my name being dragged through the mud with the lie, with the domestic violence and different things like that,

22.

that's on my record." He believed that LCCS "could have helped me out even more" with finding housing, but did not elaborate on what else LCCS could have done.

{¶ 58} At the time of the hearing, father had supervised visits with the child twice a week. He admitted that he missed a few visits and recalled that one missed visit was because he had a doctor appointment. He could not remember why he missed the other visits, but he "had an excuse for it."

{¶ 59} Father admitted to falling asleep during visits, which he blamed on his sleep apnea. He had surgery to correct the condition in May 2019. The surgery helped him sleep longer at night and he was doing "a lot better" at staying awake during the day. However, he continued to fall asleep at visits after his surgery. He blamed that on not "allow[ing] myself to go to bed properly" and explained that he was volunteering at St. Paul's shelter early in the morning on visit days. He said that he would not continue volunteering at the shelter if he had custody of the child.

{¶ 60} Although father had known about the permanent-custody hearing for months, he was unable to tell the trial court what his plan was for the child if he received legal custody of her that day. He did not know the names of the child's doctors, did not have a bed for her to sleep in, and did not have a plan for childcare while he worked. He said that arranging childcare was "[l]ike any other thing in life, you know, once I get to that point in my life, then I will find out the necessary information," but he hoped that LCCS would help him arrange care if the court returned custody to him. And when asked if, assuming he received legal custody that day, he would take the child to his

23.

mother's one-bedroom apartment where he was temporarily staying, father said that he would not, but was unable to say where he would take the child. He also said that he would follow through with the child's appointments and services and would do "[a]nything that would help my daughter to be better * * *."

{¶ 61} In addition to his testimony, father submitted two character letters. The first was from a person who worked in the same building as father. The letter said that father was a hard worker, committed to his sobriety, and had shown a sincere commitment to changing and being a father to his child. The second was from father's manager at work. She wrote that father was eager to work, punctual, and willing to do what was asked of him. She also said that father was eager to rebuild his life and, in the 90 days he had been employed, father had taken advantage of programs to reinstate his driver's license, pay child support arrears, be a better father, rebuild his credit, and get his GED and manufacturing certification.

{¶ 62} Father explained to the court that he wanted custody of the child because

first of all, I love her. I grew up without a father. * * * I believe I would be the best provider for her. I mean, I know I've made a lot of mistakes, a lot of life mistakes, choices in my life. I think—I think that I want to do whatever is necessary for my daughter. My daughter, to me, is—is life changing. I feel like she—of course, she a gift from God, but I feel like she's a special gift. She makes me feel like I'm given a second chance. And I want to be able to prove myself, you know, in that area.

24.

I mean, I would do whatever I would have to do. If I would have to lay my life down, I would do that. And most importantly, I'm her father, you know. I want to be there for her. I want to see her come up. I want to meet her first boyfriend. I want to be there at her first dance. I want to be there. You know, I want to help her in some positive life choices, you know, the life that I didn't have nobody there for me, you know. * * * I'm her father. You know, I want to be able to do, you know, what's necessary, you know, for my daughter. And, you know, I—I just want to be her father. I want to be her dad.

{¶ 63} After hearing the evidence, the trial court granted permanent custody to LCCS. The court found under R.C. 2151.414(B)(1)(a) that the child could not be placed with either parent within a reasonable time. The court also found under R.C. 2151.414(E)(1) that father had not substantially remedied the problems causing the child to be removed from the home, despite LCCS offering case plan services, and under (E)(2) that father had chronic mental illness and chemical dependency that were "severe" and, because the court had not "seen enough of a track record[,] I feel that he is at this time unable to provide an adequate, permanent home for [the child]." Further, the court determined that granting LCCS permanent custody was in the child's best interest. The child, who was 23 months old at the time of the hearing, had been in a "very significant, positive" foster placement for 22 months and had clearly bonded with her foster family.

25.

The child needed a legally-secure placement that could only be achieved by awarding permanent custody to LCCS.

{¶ 64} The court characterized its decision as "tough." It noted that father "wasted a whole year" before getting and staying sober, ending his relationship with mother (and, consequently, ending his cycle of being in and out of jail on domestic violence charges), complying with the case plan, and making the child his priority. Although the court commended father for getting his life "back on track," it expressed numerous concerns about father's ability to parent the child.

{¶ 65} First, the court was concerned that father had not taken an interactive parenting class, "[s]o really nobody knows exactly how it is—how you would interact, you and she, in a parenting situation like that." Next, the court was bothered by father's frequent moves between inpatient substance abuse programs, recovery housing, and homeless shelters, which delayed his ability to find permanent housing. The court said that "the fact that you're 51 years old and have no place to live and no plan about how to get your own place until NPI comes through and you're living in a one-bedroom apartment with your mother, clearly is not something that is in the best interest, that situation, in the best interest of [the child]." Also troubling to the court was father's relatively brief period of sobriety—not quite one year—following a 30-year history of drug use and his short record of regularly taking his psychiatric medicine for his "significant" mental health needs. Finally, the court was concerned that father did not have a plan for caring for the child. Father said several times that he would rely on

26.

LCCS to help him figure out how to care for the child and did not seem to realize that the agency would be "out of the picture once [father got] custody back." The court was "very concerned" that father did not know who the child's pediatrician was and did not have housing for the child or have "a plan for financial means to get" housing for him and the child. The court explained to father that its jurisdiction over the case would expire about three weeks after the hearing and told father that it needed to "feel confident" that father was, within the next three weeks and "with no supervision from Children Services * * * prepared to completely parent this child. And I don't feel that way."

{¶ 66} The trial court issued its judgment entry on October 15, 2019. In it, the trial court terminated father's parental rights and awarded permanent custody of the child to LCCS. In doing so, the court found by clear and convincing evidence that the child could not be placed with either parent within a reasonable time or should not be placed with either parent and awarding permanent custody to LCCS was in the child's best interest.

{¶ 67} Under R.C. 2515.414(B)(1)(a), the court determined that the child could not be placed with either of the parents within a reasonable time and should not be placed with either parent.

{¶ 68} In determining that the child could not or should not be placed with father, the court made findings under R.C. 2151.414(E)(1) and (2).

27.

{¶ 69} As to (E)(1), the court found that father continuously and repeatedly failed to substantially remedy the conditions that caused the child to be placed outside of the home, despite reasonable case planning and diligent efforts by LCCS. The court found that, although father "completed a significant portion of his case plan," his case plan services were incomplete. He had not completed the recommended anger management classes (and denied needing the service) and did not have housing "largely due to his inability to maintain compliance at any one service provider for a significant period of time." The court concluded that "the delays [father] has suffered in completing his services have been his own doing."

{¶ 70} As to (E)(2), the court found that father has chronic mental illness and chemical dependency so severe that he is unable to provide an adequate permanent home for the child within one year of the hearing. The court noted that father had a "lengthy substance abuse history," self-reporting that he had been abusing drugs for approximately 30 years, albeit with periods of sobriety. Father was unable to complete his substance abuse services "in a timely manner despite having the full two years allowed by statute." The court also noted that there were several times when father allowed his mental health treatment to lapse and went without his required medicines. The court concluded that it was "likely that these issues will pervade in [father's] life for a good while to come."

{¶ 71} Additionally, the court found that father failed to complete his case plan in the two years that the case had been active. It was especially troubled by the fact that father "failed to make the necessary changes to demonstrate an ability to care for this

28.

child" in the 14 months between LCCS filing the motion for permanent custody and the permanent-custody hearing.

{¶ 72} Finally, the court determined under R.C. 2151.414(D)(1)(a), (c), and (d) that it was in the best interest of the child to award permanent custody to LCCS. Specifically, the court found that the child's relationship with her foster parents and out-of-home providers favored permanent custody, the child had been in LCCS's custody for 12 or more months of a consecutive 22-month period, and the child needed a legally-secure placement that could only be achieved by granting permanent custody.

{¶ 73} After considering all of the evidence and making detailed findings, the trial court awarded permanent custody of the child to LCCS and terminated father's parental rights.

{¶ 74} Father now appeals, raising two assignments of error:

1. The Decision of the Trial Court was Against the Manifest Weight of the Evidence because Appellant had Substantially Complied with His Case Plan Services.

2. The Decision of the Trial Court was Improper as LCCS failed to provide Reasonable Efforts in Reunifying the Family.

## II. Law and Analysis

{¶ 75} In his first assignment of error, father argues that the trial court's decision is against the manifest weight of the evidence because he substantially complied with his case plan, completing all of his goals except obtaining housing. LCCS responds that the

trial court's decision is supported by the manifest weight of the evidence and that the trial court made findings under R.C. 2151.414(E)(1) and (2), but father does not challenge the findings under (E)(2). In his second assignment of error, father argues that LCCS did not make reasonable efforts to reunify him with the child because the agency did not suggest that father reside at a family homeless shelter. We address each argument in turn.

## A. Law of Permanent Custody

{¶ 76} Revised Code 2151.414 provides the analysis that a trial court must undertake when considering whether to terminate parental rights and vest permanent custody in a children services agency. Under that provision, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a)-(e) exists. Subsection (a) requires a finding that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent; subsection (b) requires a finding that the child is abandoned; subsection (c) requires a finding that the child is orphaned and there are no relatives who are able to take permanent custody; subsection (d) requires a finding that the child has been in the temporary custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period; and subsection (e) requires a finding that the child or another child the parent had custody of has been adjudicated abused, neglected, or dependent on three separate occasions.

30.

{¶ 77} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest *and* whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.,* 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 42-43. If the court finds that at least one factor in R.C. 2151.414(E) applies, it must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

{¶ 78} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14.

{¶ 79} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 20. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). But while we review the evidence and consider

31.

the witnesses' credibility, we must be mindful that the trial court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal quotations omitted.) *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

### B. R.C. 2151.414(E) Findings

{¶ 80} Father first argues that the trial court's findings under R.C. 2151.414(E)(1) are not supported by the manifest weight of the evidence.

{¶ 81} In this case, the trial court found that R.C. 2151.414(B)(1)(a) applies, so it examined the R.C. 2151.414(E) factors. "[A] court need only find *one* factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent * * *." (Emphasis added.) *In re Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, ¶ 38; *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 50, citing *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996), syllabus.

{¶ 82} As relevant here, the court found that R.C. 2151.414(E)(1) and (2) were applicable to father. The statute provides:

> (1) Following the placement of the child outside the child's home
> and notwithstanding reasonable case planning and diligent efforts by the

32.

agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness * * * or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *[.]

R.C. 2151.414(E).

{¶ 83} As a preliminary matter, we note that R.C. 2151.414(E) directs a trial court to enter a finding that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent when it finds *any* of the enumerated factors applicable. Thus, even if the trial court erred in concluding that (E)(1) was applicable to father, it also made findings under (E)(2)—that father does not challenge—which is sufficient to support its conclusion that the child could not be placed with father within a reasonable time or should not be placed with father. *See In re Destiny C.*, 6th

33.

Dist. Lucas No. L-08-1147, 2008-Ohio-5292, ¶ 26 ("A proper finding of any one of the R.C. 2151.414(E) factors is sufficient to sustain a conclusion that the children cannot now, or in a reasonable time, be reunited [with the parents].").

{¶ 84} The record shows that father made significant improvements in his life and achieved many of his case plan goals: he attended substance abuse treatment, had been drug-free for nearly a year, and was providing clean drug screens; he was fairly consistent with his mental health appointments and taking his prescribed medicine; he visited the child regularly; he completed a domestic violence batterers' class; he divorced mother, who he said was a trigger for him; he completed a parenting class (although it was not an "agency approved parenting class" and did not include the interactive component that the case plan required); and he had a job, a driver's license, and a car.

{¶ 85} To help father reach his goals, LCCS provided referrals, arranged supervised visits, and worked with father to find a provider to conduct a SOT assessment. Fischer also connected father to subsidized housing resources, but father was ineligible for the available programs. When subsidized housing was ruled out, Fischer suggested that father find an unsubsidized apartment. Father did so, but he ultimately chose not to move into the apartment because of issues with his potential roommate.

{¶ 86} Regardless of father's efforts and LCCS's assistance, there were still unaddressed areas of concern that demonstrate that father had not remedied the conditions causing the child to be removed from the home.

34.

{¶ 87} First, father completed the initial assessment for a SOT program, and the evaluator determined that father did not need the program. However, the evaluator recommended that father take anger management classes and "encourage[d]" LCCS to "maintain supervision and support [of father] for a long time to come." Father did not believe that he needed the recommended anger management classes and did not take them.

{¶ 88} Next, as recently as three months before the permanent-custody hearing, father missed some of his mental health appointments and did not have the psychiatric medicines he needed to control his "significant" mental health issues.

{¶ 89} Third, father did not have suitable housing, which the trial court attributed to father's failure to engage in services and treatment for the first year that the case was open and making choices that led to him constantly changing service providers. Although father was on a waiting list for housing, there was no evidence of how long his wait might be. Father said that he did not intend to live with the child in his mother's one-bedroom apartment (where he was staying at the time of the permanent-custody hearing), but he did not have a plan for housing the child until he had a place of his own.

{¶ 90} Fourth, there were questions about how father would parent the child. The child had been in foster care since very shortly after her birth, so father had never been responsible for taking care of her. Father did not take an interactive parenting class that would have allowed LCCS to see how he interacted with the child and handled her behaviors. Father never progressed beyond supervised visits, so he had never been

responsible for the child outside of an agency setting. And father fell asleep—consequently failing to supervise the child, who was an active toddler—during visits even after he had surgery to correct his sleep apnea. He testified that his early morning volunteer shift at St. Paul's shelter caused the sleepiness after his surgery, but he did not stop volunteering or change his hours to ensure that he would be awake and alert while he was with the child.

{¶ 91} Fifth, father had only a short period—11 months—of sustained sobriety. This is troubling when considered against father's 30-year history of drug abuse. Father's testimony also showed that he was unable to maintain his sobriety when he had custody of two of his other children. Father said that he had custody of the twins for nine years and recalled that he was in the process of obtaining custody of them in 2005 when he was accused of sexually abusing a child. He also said that his longest period of sustained sobriety was from 2011 to 2015. The logical conclusion to draw from this testimony is that father used drugs while he had custody of his children.

{¶ 92} Finally, and perhaps most concerning, father did not have a plan for caring for the child if he received custody. He did not know who the child's medical providers were, did not have a permanent home or a bed for the child, did not have a plan for childcare while he worked, and did not realize that, once the case was closed, LCCS could not provide him the assistance that he expected from the agency.

{¶ 93} As the trial court said, this is a "tough case" because father made so much progress. Ultimately, though, father's unresolved issues show that he failed to remedy

36.

the issues that led to the child being removed from the home, and we cannot say that the trial court clearly lost its way or created such a manifest miscarriage of justice that the decision must be reversed. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶ 94} Moreover, the trial court was only required to make a finding under one of the R.C. 2151.414(E) subsections to support granting permanent custody to LCCS. *Carlos R.*, 6th Dist. Lucas No. L-07-1194, 2007-Ohio-6358, at ¶ 38. Even assuming that the trial court's (E)(1) findings were not supported by the record, it also found that the child could not or should not be placed with father under (E)(2). Father does not challenge this finding. Thus, we find that the trial court did not err in finding that the child could not or should not be placed with father.

{¶ 95} Father's first assignment of error is not well-taken.

### C. Reasonable Efforts

{¶ 96} In his second assignment of error, father argues that LCCS did not make reasonable efforts to reunify him with the child because Fischer never suggested that father stay at a homeless shelter that accommodates families.

{¶ 97} Generally speaking, under R.C. 2151.419(A)(1), the state must have made reasonable efforts to reunify the family prior to the termination of parental rights. *C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 21. However, "[b]y its terms, R.C. 2151.419 applies only at hearings held pursuant to R.C. 2151.28, 2151.31(E), 2151.314, 2151.33, or 2151.353"—pertaining to adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or

37.

dependent children. *Id.* at ¶ 41; *In re A.A.*, 6th Dist. Lucas No. L-17-1162, 2017-Ohio-8705, ¶ 35. It does not apply to hearings on a motion for permanent custody filed pursuant to R.C. 2151.413. *C.F.* at ¶ 43. Nonetheless, other statues may require the agency to prove, prior to the permanent-custody hearing, that it made reasonable efforts to reunify the family. *Id.* at ¶ 42. Regardless, when "the trial court relies on R.C. 2151.414(E)(1) at a permanency hearing, the court must examine the 'reasonable case planning and diligent efforts by the agency to assist the parents' when considering whether the child cannot or should not be placed with the parent within a reasonable time." *Id.*

{¶ 98} "Reasonable efforts" are "'honest, purposeful effort[s], free of malice and the design to defraud or to seek an unconscionable advantage.'" *In re S.R.*, 6th Dist. Lucas Nos. L-12-1298 and L-12-1326, 2013-Ohio-2358, ¶ 21, quoting *In re Weaver*, 79 Ohio App.3d 59, 63, 606 N.E.2d 1011 (12th Dist.1992). "In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *Id.*

{¶ 99} Here, father's only argument regarding reasonable efforts is that LCCS failed to tell him about a homeless shelter at which he could live with a child. Nothing in the record suggests that Fischer told father about the possibility of living in a family shelter as a solution to his lack of housing. But Fischer did (1) attempt to place father in LCCS's family unification housing program, but father did not qualify because of his criminal and eviction history; (2) discuss housing through the Lucas Metropolitan

38.

Housing Authority, but father did not qualify because of his eviction history; (3) discuss housing through Madonna Homes, but father did not qualify because of his criminal history; (4) suggest that father rent an unsubsidized apartment, which fell through because father's potential roommate was actively using drugs; and (5) connect father with a community advocate who helped him apply for housing through NPI, where his application was accepted, but he was on a waiting list. Although Fischer testified that father applied for housing with the assistance of his case manager at either Zepf or Midwest, she also said that she told father that LCCS and the community advocate did not have housing resources beyond those that father's case manager shared with him.

{¶ 100} Considered together, we believe that Fischer's actions show that LCCS made an "'honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage'" to help father find suitable, stable housing for him and the child. *S.R.* at ¶ 21, quoting *Weaver* at 63. Fischer informed father of several viable housing alternatives that, unfortunately, did not work out for reasons beyond LCCS's control. There is no evidence that Fischer withheld housing resources from father or completely failed to assist him with his housing issues. Moreover, father assumes that he would have qualified to live in a family shelter and that LCCS and the trial court would have considered a family shelter appropriate housing, but the record is far from clear on these points.

{¶ 101} In short, the issue here is not whether LCCS *could have* done more, but whether the things LCCS *actually did* were sufficient to meet the statutory standard of

39.

"reasonable efforts." *Id.* We find that they were. Accordingly, father's second assignment of error is not well-taken.

### III. Conclusion

{¶ 102} We have thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits. We find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Father's assignments of error are without merit.

{¶ 103} Therefore, the October 15, 2019 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Father is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.       _____
                      JUDGE

Arlene Singer, J.          

Christine E. Mayle, J.      _____
CONCUR.                   JUDGE


                   _____
                      JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.